# The Cleveland and Pittsburg Railroad Company *versus* Speer.

1. A charter granted by two states to a company to construct a railroad is not only a contract with the company, but a compact between the states. It is to be liberally construed with reference to its objects. Like a treaty, it is the law of the contracting states, not being subject to interpretation by the local usages of either. The same construction must be made in both.

2. The Cleveland and Pittsburg Railroad Co. having the right to extend their road to Pittsburg, it was wholly in the discretion of the managers of the company where the work should begin.

3. A railroad company may use a street or highway when authorized by its charter, expressly or inferentially.

4. "Land" in railroad charters has its common-law and technical meaning comprehending all structures upon it.

5. A company was authorized to locate its railroad by the most direct and

[Cleveland and Pittsburg Railroad Co. *v.* Speer.]

least expensive route ; after the location and construction had become complete, the exercise of the discretion of the company in the location could not be reviewed.

6. If the act of location had been voidable, none but the Commonwealth can call the company to account.

7. An action at common law will not lie for a private injury by the execution of legal powers exercised judiciously and carefully.

8. Canal and railway companies are not liable for consequential damages in the exercise of the power of eminent domain from the state.

9. The only competent evidence to prove a forfeiture of a charter is the judgment of a court directly on the point.

10. The power to construct a road includes the authority to make switches, although not expressed ; side-tracks are essential to the use of the road.

11. The spot where the connection of switches, &c., with the main track should be is in the absolute discretion of the company and cannot be readjudged by a private citizen.

12. If the company located the switches, &c., in one place, it did not strip itself of the power, when its necessity required, to place them elsewhere.

13. An action cannot be maintained by a citizen for injury to his property from noise, smoke and stench of locomotives and trains arising from the location of railroad switches and side-tracks near his house.

14. The powers granted to the Cleveland and Pittsburg Railroad examined and construed in this case.

November 14th and 15th 1867.    Before THOMPSON, STRONG, READ and AGNEW, JJ.    WOODWARD, C. J., absent.

Error to the Court of Common Pleas of *Allegheny county :* No. 115, to October and November Term 1867.

This was an action on the case, to March Term 1866, by James A. Speer against the Cleveland and Pittsburg Railroad Company. The question was principally as to the powers of the company to lay down tracks, switches and sidings in the borough of Manchester.

On the 14th of March 1836 the legislature of the state of Ohio passed an act incorporating The Cleveland and Pittsburg Railroad Company.   By the 11th section the company were authorized " to construct a double or single railroad or way from Cleveland, on the most direct and least expensive route to some point in the direction of Pittsburg, on the state line between Ohio and Pennsylvania, or on the Ohio river."   And by the 12th section they were " invested with all rights and powers necessary for the location, construction and repair of said road, not exceeding one hundred feet wide, with as many sets of tracks as the said president and directors may deem necessary."   The act was to be void unless the road should be commenced in three years and be finished in fifteen years from its commencement.

By another act of the legislature of the same state, passed March 11th 1845, the first act was revived, the road to be commenced in five years and completed in twelve years from its commencement.

By an act of the legislature of Pennsylvania of the 8th of April 1850, § 2 (Pamph. L. 417), the Cleveland and Pittsburg Rail-

road Company were authorized to extend their road from the eastern line of the state of Ohio up the valley of the Ohio river, to a point near the mouth of the Big Beaver, and connect with the Ohio and Pennsylvania Railroad Company, where the two companies may agree.

On the 18th of April 1853, the legislature of Pennsylvania passed an act (Pamph. L. 473) giving the full and entire assent of the Commonwealth to all and each of the provisions contained in the foregoing laws of the state of Ohio, "and all and each of the provisions, conditions and restrictions thereof, as fully and effectually as if the same were enacted, section by section, so far as the same can apply in this Commonwealth, reserving always to this Commonwealth the same and like rights and powers in all respects in and over that part of the contemplated railroad which may be in the state of Pennsylvania, as has been reserved and provided in the said recited acts of the state of Ohio in and over that part of the said railroad which may be in the state of Ohio, and the said acts shall be in full force and effect, according to the true intent and meaning thereof, wheresoever the same are applicable, as well within as without this Commonwealth, to incorporate the Cleveland and Pittsburg Railroad Company for all and every object and purpose therein set forth and provided, and all the acts and proceedings of the corporators, stockholders and directors of the said Cleveland and Pittsburg Railroad Company, which have been legally done in pursuance of the above-recited acts of the state of Ohio, shall have the same validity, force and effect in this state and elsewhere, as if they had been subsequent to the passage of this act, and in pursuance thereof."

The Pennsylvania act also required that the settlement of damages by the construction of the road in this state should be under the General Railroad Law of February 19th 1849. The 7th section authorized the company "to extend their railroad into this state from the point where it may cross the west line of this state, in the county of Beaver, and to continue it up the valley of the Ohio river and connect with any railroads running in the direction of or terminating in Pittsburg." This act repealed the 2d section of the Act of 1850, authorizing the connection with the Ohio and Pennsylvania Railroad.

In passing up the valley of the Ohio the road goes through the borough of Manchester, which lies across the valley. The councils of that borough, at a special session held October 27th 1856, at which the plaintiff, who was a member of the council, was present, passed an ordinance authorizing the company to construct and maintain a road with a single track along Preble street, from the north end thereof to Walnut street, and thence with one or more tracks to the Ohio river, limiting the speed of the trains to

four miles per hour, and requiring them to use coke or coal through the borough; and forbidding them to suffer their rolling-stock to remain " in such position as to interfere with the business and travel of the citizens." On the 12th of April 1862, the legislature of Pennsylvania passed another act (Pamph. L. 436), by which the Act of 1853 was revived and renewed, and the time for completing the Cleveland and Pittsburg Railroad " from Rochester, Beaver county, into the city of Pittsburg, under the charter of the company, extended ten years."

The plaintiff declared that he was possessed of a lot of ground with a dwelling-house on it, the lot fronting on Preble street, in the borough of Manchester, and that he had occupied the house with his family for more than ten years; that the defendants, about the year 1858, " wrongfully, injuriously and negligently erected and made upon the side of Preble street, immediately opposite the house aforesaid, two switches whereby the street and sidewalk are encroached upon and constantly blockaded with cars, producing great noise and throwing off great volumes of smoke," and have kept the switches for a long time, &c., whereby noxious and offensive smells from cattle, &c., and large volumes of smoke penetrate his house, rendering it unwholesome, &c., and greatly annoyed, &c., the plaintiff and his family, and prevented him from enjoying his said property in as ample and beneficial a manner as he otherwise would and ought to have done, and the said house and appurtenances have become lessened in value, &c.

The defendants pleaded " not guilty," and the Statute of Limitations.

The annexed draft exhibits the position of the plaintiff's house, tracks, switches, &c.

The plaintiff gave evidence that the track was laid on Preble street, in front of his house; that it crosses Walnut street, which intersects Preble street at right angles, the plaintiff's house being in the north-east corner of the intersection; the track runs about the centre of Preble street, nearly parallel with the Ohio river; that the company own an entire square of ground on the east side of Preble street and on the south side of Walnut street. There was evidence also of the depreciation of value to plaintiff's property, by the noise, smoke, &c., and that the damage would have been less if the switches had been south of Walnut street.

Beside the several Acts of Assembly and the borough ordinance, the defendants gave evidence that the switches and sidings could not have been made any shorter to get to their machine-shops; that the switches had been in use about eight years. They also gave evidence that the route of the road through Manches-

[Cleveland and Pittsburg Railroad Co. *v.* Speer.]

[Cleveland and Pittsburg Railroad Co. v. Speer.]

ter was the most feasible, least expensive and most practicable route to Pittsburg. They further gave in evidence the following agreement made between the company and the street commissioners, acting under the authority of the council:—

"The Cleveland and Pittsburg Railroad Company hereby agrees to the following specification of repairs to be done by them on Walnut street, viz. :—

"The track and switches to remain as they now are until such time as the said company shall make the contemplated change in the same ; said tracks to be kept well planked and in good order. Cast-iron culverts on the south side, running to the lines of property, and said culverts are not to be less than 16 by 36 inches."

The defendants submitted a number of points, several of which involved this question, which was reserved by the court:—

"Whether the company, defendant, under its charter and the action of the borough authorities, or either, had the right to construct, maintain and use the switches complained of."

On this question the court (Sterrett, P. J.) charged *pro formâ* in favor of the plaintiff, and added : "If the company had the rights claimed in the reserved question here enumerated, there is nothing in the testimony that would justify a recovery by the plaintiff in this action."

There was a verdict for the plaintiff for $1362.50, subject to the opinion of the court on the reserved question. The court afterwards directed judgment to be entered on the verdict.

The defendants took a writ of error. The only assignment of error considered in the Supreme Court was that arising upon the decision of the court below on the reserved question.

*W. S. C. Otis* and *S. & S. C. Schoyer*, for plaintiffs in error, referred to the several Acts of Assembly given in the statement of the case : to Commonwealth v. Erie & N. E. Railroad, 3 Casey 339, 354, 355 ; Ohio & Miss. Railroad v. Wheeler, 1 Black 286 ; Allegheny Co. v. Cleveland & Pittsburg Railroad, 1 P. F. Smith 228 ; New York & Erie Railroad v. Young, 9 Casey 175 ; Belleville Railroad v. Gregory, 15 Ill. R. 20 ; Pennock v. Coe, 23 Howard 117–132 ; Commonwealth v. Central Pass. Railway, 2 P. F. Smith 506–517 ; Irvine v. Lumberman's Bank, 2 W. & S. 190, 204 ; Dyer v. Walker, 4 Wright 157 ; Coil v. Pitts. Fem. Col., Id. 439 ; Angell & Ames on Corp., § 777 and cases cited ; Hayes v. Covington, 13 S. & M. 408 ; Commonwealth v. Del. and Hudson Canal Co., 7 Wright 295.

*S. A. & W. S. Purviance* and *B. F. & A. G. Lucas*, for defendant in error, also cited the above mentioned ; likewise Commonwealth v. Erie & N. E. Railroad, 3 Casey 351 ; Commonwealth

v. Bowman, 3 Barr 206; Lancaster Turnpike v. Rogers, 2 Id. 114; Rung v. Shoenberger, 2 Watts 24; Commonwealth v. Rush, 2 Harris 191; Stormfeltz v. Manor Turnpike, 1 Id. 560; 1 Hilliard on Torts 117, 635, 646; 2 Id. 367, 419; Lewis v. Jones, 1 Barr 336; 2 American Railway Cases 37.

The opinion of the court was delivered, January 7th 1868, by

Agnew, J.—This is an action of tort against the railroad company for wrongfully erecting and continuing two switches on Preble street, in the borough of Manchester, opposite the dwelling-house of the plaintiff, the plaintiff claiming special damage from the penetration of his house by noisome smells and volumes of smoke.

It is to be noticed that the declaration does not allege, and the proof did not show, any negligence or abuse in the manner of constructing or of using the switches. The court reserved this question—" Whether the company under its charter and the action of the borough authorities, or either, had the right to construct, maintain and use the switches complained of?"

The court below gave no reasons for its decision, but having entered a judgment against the railroad company on the reserved point, in effect decided against the right to build its road where it did, for the right to build the switches and sidings there, is as clear under the charter as to build the main track.

There are but two grounds upon which the authority of the company seems to be denied: First, that it had no right to extend its road to the city of Pittsburg; second, that it had no right to locate it on Preble street, a public highway of the borough of Manchester.

The right to extend its road to Pittsburg cannot be doubted. The purpose of the Ohio charter is plain upon its face. The name given to the company was the Cleveland and Pittsburg Railroad Company, thus clearly indicating Pittsburg as its eastern terminus. Not having the power to authorize the building of the road to Pittsburg, the Ohio legislature, in order to invite the co-operation of Pennsylvania, empowered the company to build its road from Cleveland to *some point* in the direction of Pittsburg, on the state line between Ohio and Pennsylvania. Responding to this invitation to co-operate, the Pennsylvania legislature in 1853 adopted the Ohio charter in all its length and breadth, and authorized the company to extend its railroad into this state *from the point* where it may cross the west line of the state, and to continue it up the valley of the Ohio river, and connect with any railroads running in the direction of or terminating in Pittsburg. This language derives force and meaning from the previous Act of 1850. At first the Pennsylvania legislature did not close with the offer of Ohio, and merely authorized

the company to extend its road from the state line to the mouth of the Big Beaver, and there to connect with the Ohio and Pennsylvania Railroad.   But the Act of 1853 accepted the Ohio proposition by adopting its charter and repealing the Act of 1850, thus removing the impediment of the advance of the road up the Ohio valley to Pittsburg.   Thus the two states clasped hands upon the project, the purpose of which is as clear as sunlight, of building a railroad from the city of Cleveland, on Lake Erie in the state of Ohio, to the city of Pittsburg in Pennsylvania, the terminus of the Central Pennsylvania Railroad, furnishing by this means a continuous communication between Lake Erie and the Atlantic Ocean.

The rule given to us for the interpretation of such a charter is found in the opinion of Gibson, C. J., in Brockett *v.* Ohio and Pennsylvania Railroad Co., 2 Harris 244: "The joint act of incorporation (says he) is not only a contract with the company, but a compact between the states that are parties to it." * * "The charter is not to be compared with the charter from an individual state ; it is to be liberally construed with reference to the magnitude of the enterprise by giving the company the necessary means to accomplish the purposes of its creation.   Like a treaty, it is the law of the contracting states without being subject to interpretation by the local usages of either.   The same construction of it must be made in both."

Looking at the language giving the authority to extend into Pennsylvania, conjointly with the evident purpose of the treaty between the states of making a grand route of inter-communication between the two important cities named as the termini, we find that the authority to connect with other railroads is not single, but plural—it is to connect with any *railroads* running in the direction of, or *terminating in, Pittsburg*.   But if there were any doubt of the meaning of the Act of 1853, it is removed by the Act of 1862.   It revived and renewed the *charter*, and extended for ten years the time for constructing and completing the road from Rochester, in Beaver county, *into the city of Pittsburg*.   This was both an interpretation and a recognition of the authority to extend the road into Pittsburg.

Having the clear right to extend the road into the city of Pittsburg, it was a matter wholly in the discretion of the president and directors of the company where the work should begin : Commonwealth *v.* Franklin Canal Co., 9 Harris 127.

This brings us to the second question—the right of the company to use Preble street for its road.   It does not admit of a doubt, in this state, that a railroad company may use a public street or highway when authorized by its charter expressly or inferentially : Philadelphia and Trenton Railroad, 6 Whart. 43, 44 ; Mifflin *v.* Railroad Co., 4 Harris 192, 193 ; Commonwealth

*v.* Erie and N. E. Railroad Co., 3 Casey 354. Although the power is not expressly given in this charter, the implication is irresistible. The authority given is to continue the road up the valley of the Ohio river to Pittsburg. Being restricted to the *valley*, it must necessarily pass through the borough of Manchester, which stands across the whole valley.

The power of the company to adopt any one of the streets of that borough passing through it, will now be seen more distinctly by examining the special provisions of the charter.

· The 11th section authorizes "the corporation to construct a double or single track railroad *on the most direct and least expensive route*," and the 12th section invests the president and directors, in the execution of this power, with *all rights and powers* necessary for the *location*, *construction* and repair of said road, not exceeding one hundred feet wide, *with as many sets of tracks* as the said president and directors may deem necessary." And *they may enter upon and use* and excavate *any land which may be wanted* for the site of said road, and for any other purpose necessary and useful in the construction and repair of said road or its works." The phrase "any land" has received an interpretation in the case of Brockett *v.* Ohio and Pennsylvania Railroad Co., *supra*.

In that case no special necessity was shown for taking a dwelling-house, but the case was rested wholly upon the discretion which it was held must necessarily be exercised by the company in selecting the best route for its road. Land was therefore held to have its common law and technical meaning as comprehending all structures upon its surface. Granting the power then to pass through the houses and lots of Manchester, yet no one can deny that it is far less expensive, and certainly not half so injurious to the citizens, to use one of the streets of that borough to pass through. Here, then, is a full power to enter upon any land, whatever may be its superincumbent structures; and certainly the surface of a street is not more sacred than the dwellings of the people. This action was brought in 1866, while this part of the railroad was located in 1857, built immediately and has been in use ever since. Having been thus located and built, and not only without objection, but with the actual consent of the borough authorities, we are bound to presume, until the contrary is shown in due course of law, that the location on and along Preble street was a judicious and proper location, by the "most direct and least expensive route," according to the terms of the charter. As a matter of fact, indeed, we know that it is so. We refer now to its terminus in the city of Pittsburg with the Pennsylvania Central Railroad at Duquesne Point, where it might then have connected in the exercise of the discretion clearly conferred.

But assuming that Preble street might not be the most direct

route, and least expensive location, how can the plaintiff, in this collateral way, review or revise the exercise of the discretion given to the company after its location and construction of the road at this point has become complete, and it has been in the enjoyment of its franchises upon this ground for years? Having a general authority to build its road up the valley of the Ohio, and consequently through Manchester, which traverses its route, and having a general authority also to enter upon any lands wanted for the site of its road, with all the rights and powers necessary for its location and construction, it exercised the power of eminent domain belonging to the sovereignty of the state, by the selection of Preble street for this location, built its road thereupon, and has long been in its daily use for its public purposes. Clearly the use it now makes of the street is a part of its franchise. It is a liberty granted by the sovereign to its subject, in which the latter cannot now be disturbed except by the sovereign power. The location of the route, the act on which its franchise rests, and without which the franchise falls, was done under a general authority, and in the exercise of a discretion conferred. To revise and attempt to correct the location, is to interrupt and destroy the franchise itself; and clearly this does not belong to individual right. The act of location was not void, and if voidable because other ground ought to have been taken, none but the Commonwealth can now call the company to account for it.

Whatever private remedies individuals might have had to prevent the location there, and to compel a change of site before consummation, it is now too late to treat the location as a mere nullity; and yet this is the effect of the judgment of the court below. Without entering into a discussion of the authorities, I think the principle asserted will be found to be fully sustained by the following: Clarke *v.* Bridge Co., 5 Wright 147; Cleveland, P. & A. Railroad Co. *v.* City of Erie, 3 Casey 387; Bridge Co. *v.* Kirk, 10 Wright 130; Murphy *v.* Farmers' Bank, 8 Harris 419; New York and Erie Railroad *v.* Young, 9 Casey 175, 182; Plymouth Railroad Co. *v.* Colwell, 3 Wright 341; 2 Kent Com. 312; Ridge Turnpike Co. *v.* Stoever, 6 W. & S. 378; Dugan *v.* Bridge Co., 3 Casey 313; Philadelphia, Wilmington and Baltimore Railroad Co. *v.* Williams and Wife, decided at Philadelphia, January 7th 1867, 4 P. F. Smith 103. No action at common law will lie for one who has sustained a private injury by the execution of legal powers exercised judiciously and carefully. This principle is well sustained by the authorities collected in the note to 1 American Railway Cases 166. Another form of stating the same principle is to be found in the cases of this state, wherein it is said that canal and railway companies are not liable for consequential damages in the exercise of the power of eminent

[Cleveland and Pittsburg Railroad Co. v. Speer.]

domain under the authority of the state: 9 Casey 180; 4 Harris 193; 8 W. & S. 86.

To exercise a franchise is to use a part of the public rights of the state, and is to be called in question only at the instance of the public. To be a corporation is itself a franchise: 2 Kent Com. 267; 3 Kent Com. 459; 8 Harris 419; and it is well settled that the only competent evidence to prove a forfeiture of charter is the judgment of a court directly on the point: Irvine v. Lumberman's Bank, 2 W. & S. 203; 4 Angell & Ames on Corporations, ed. 1843, p. 507; Dyer v. Walker, 4 Wright 157; Turnpike Co. v. McConaby, 16 S. & R. 140.

The power of the company to run its road to Pittsburg, and to locate and construct it on Preble street, being established, it carries with it the authority to make and maintain the switches which are the direct subject of this action. By the express words of this charter, the power is conferred of making as many sets of tracks as are deemed necessary. But if this were not expressed, it is clearly to be inferred from the general powers conferred, and the essential purposes of the grant. A power to build side tracks, is essential to the purpose and use of the road. A power to build a railroad of a single track, without the means of passing the trains or of leaving the track for the shifting of cars, or of repairs at the shops and yards, and without standing-room for the cars not in motion, would be clearly wanting in all that is necessary to safety, convenience and utility, and would be vain and nugatory. This point was determined in the case of Philadelphia, Wilmington and Baltimore Railroad Co. v. Williams and Wife, already cited. The essential powers of a corporation may be inferred, as well as expressed: Ridge Turnpike Co. v. Stoever, 2 W. & S. 548; Clarke v. Bridge Co., 5 Wright 157; Linton v. Bridge Co., 1 Grant 414.

A switch is but a mechanical contrivance or movable opening, to pass the cars from one track to another. The right to side tracks for standing-room, or to pass from the main track to the shops or yards of the company, being clearly given, the spot where the openings in the main tracks should be placed falls within the absolute discretion of the company, and cannot be readjudged by a private citizen who lives along the line of the road. It was the right of the company, therefore, to place their switches above or below Walnut street. If, in a spirit of accommodation, the company was willing for the time being to confine itself to the south side of Walnut street, it did not thereby strip itself of the power of going north of it when it found it necessary to lengthen the curve of its side tracks, in order to reach its shop and yards in safety. Nor have we any power in this action to say, because it owned the ground on which its engine-house stood, that it should have located the house further from Walnut street, and

[Cleveland and Pittsburg Railroad Co. *v.* Speer.]

thus lengthened the course; and located the switches further south. This belonged to its discretion, and cannot now be reviewed.

Upon the whole case the action cannot be sustained, and the judgment is therefore reversed, and judgment now given for the defendants on the reserved question *non obstante veredicto.*