Statement of Facts.


## W. W. GROFF ET AL. v. BIRD-IN-HAND TURNP. Co.

APPEAL BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS
OF LANCASTER COUNTY.

Re-argued May 18, 1891—Decided October 5, 1891.
[To be reported.]

A turnpike company, incorporated under the act of April 29, 1874, P. L.
73, by a charter which specifies the termini of its roadway but is silent
as to the intermediate route, cannot appropriate an existing public high-
way between the termini, to avoid the necessity of acquiring a new
route through private property: Groff's App., 128 Pa. 621, affirmed:
Mr. Chief Justice PAXSON and Mr Justice GREEN dissenting.


Before PAXSON, C. J., STERRETT, GREEN, CLARK, WIL-
LIAMS, McCOLLUM and MITCHELL, JJ.

No. 92 July Term 1889, Sup. Ct.; court below, Equity
Docket No. 2, page 271, C. P. in Equity.


After the opinion was filed in Groff's App., 128 Pa. 621, the
petition of the defendant company, joined in by nine other
turnpike companies, was filed, praying for a re-argument of the
cause; whereupon, on May 7, 1890, an order was made for a
re-argument before a full bench.

In the former report of the case, the facts as found by the
master were stated fully, but it is suggested that the following
facts appearing should not have been omitted, to wit:

Application was first made to the governor for a charter of
incorporation of the Bird-in-Hand Turnpike Company, to con-
struct and maintain a turnpike between two points named on
the "Old Philadelphia Road," with express power to occupy
said road between such termini. After a hearing and argu-
ment for the company, and on behalf of taxpayers opposed to
the grant, the governor refused to issue the charter applied
for. Another application was then made for incorporation
" for the purpose of constructing and maintaining an artificial
road, or turnpike of stone, gravel and earth, to commence at a
point at the terminus of the Bridgeport & Horse Shoe turnpike,
in East Lampeter township, in the county of Lancaster, and

end at the township line between East Lampeter and Leacock townships, in the county of Lancaster, near the village of Bird-in-Hand, a distance of about three and one half miles. The whole of said proposed road is situated in Lancaster county."

The terminal points mentioned were on the old Philadelphia road. Upon this application, a charter was granted on September 21, 1885, under the act of April 29, 1874, P. L. 73, and duly recorded in the recorder's office for Lancaster county on September 23, 1885. It was stated in the appellee's paper-book that a string drawn from one of the terminal points to the other would lie on the bed of the old Philadelphia road for the whole distance, save at one point where private property projected a little further in one direction than at other points.

The company was organized, and, by October 5, 1885, when the plaintiffs' bill in this case was filed (about two weeks after the charter was obtained), it had commenced the construction of its turnpike on the bed of the old Philadelphia road, and had expended about nine thousand dollars in the work. No preliminary injunction being awarded on the filing of the bill (so far as appeared from the paper-books), the company continued its work, and on the completion of the road, at a cost of about twenty thousand dollars, applied to the Court of Quarter Sessions for the appointment of viewers and for an order authorizing the erection of toll-gates, under clause 5, § 30, act of April 29, 1874, P. L. 86. The application was held over until the final disposition of the pending bill in equity.

*Mr. W. U. Hensel* (with him *Mr. J. Hay Brown, Mr. B. F. Davis* and *Mr. H. M. Houser*), for the appellants.

In addition to the authorities cited on the former argument, counsel cited: Pittsb. Junction R. Co.'s App., 122 Pa. 531; St. Louis etc. R. Co. v. Haller, 82 Ill. 212; Boston & Alb. R. Co., 53 N. Y. 579; Boston & Me. R. Co. v. Railroad Co., 124 Mass. 373; Cheshire v. County Commissioners, 118 Mass. 392; Fall River I. Works v. Railroad Co., 5 Allen 221; Cleveland etc. R. Co. v. Speer, 56 Pa. 325; Commonwealth v. Canal Co., 21 Pa. 127; New York etc. R. Co. v. Young, 33 Pa. 175.

*Mr. H. M. North* (with him *Mr. S. H. Reynolds, Mr. D. Mc-Mullen* and *Mr. Owen B. Jenkins*), for the appellee.

Opinion of the Court.

That, the termini of the road having been fixed by the charter, its intermediate location was left to the discretion of the directory, counsel cited: New York etc. R. Co. v. Young, 33 Pa. 175; Cleveland etc. R. Co. v. Speer, 56 Pa. 325; Pittsb. etc. R. Co. v. Commonwealth, 104 Pa. 583; § 2, act of June 13, 1836, P. L. 555. That a turnpike road was a public highway and could not be closed against public use: Pittsb. etc. R. Co. v. Commonwealth, 104 Pa. 586; and here was no destruction of an existing use: Cane v. Plankroad Co., 2 Ohio 419; Mills on Em. Dom., § 34; Angell on Highways, 3d ed., 98; nor was the payment of tolls an interference with the public use: Mills on Em. Dom., § 34; McClenachan v. Curwin, 3 Y. 362, 373; Cleveland etc. R. Co. v. Speer, 56 Pa. 325; Struthers v. Railway Co., 87 Pa. 282.

OPINION, MR. JUSTICE MITCHELL:

The re-argument and further consideration have failed to change our views, and we therefore adhere to the opinion and judgment heretofore filed in this case.

MR. CHIEF JUSTICE PAXSON, DISSENTING:

A re-argument has been ordered in this case, and it has now been heard before a full bench. Justice GREEN and myself dissented from the judgment on the first hearing: See Groff's App., 128 Pa. 621; and, as the majority of the court adhere to the views then expressed, I desire to place upon the record the reasons why I cannot unite with them.

Aside from the merits of the case, I would affirm this decree on the ground of the complainants' laches. This bill was not filed until after the contracts for the construction of the turnpike road were entered into and half of the work done. They saw the work going on day by day; it was before their eyes, and they did not file their bill until the defendants had expended about nine thousand dollars on the road. This delay, under all the authorities, ought to have been fatal to any application for an injunction. In Orne v. Fridenberg, 143 Pa. 487, opinion filed herewith, we refused, by a unanimous decision, to restrain a violation of building restrictions on the ground of laches. The authorities upon this point are so clear and so numerous that I may well be excused from a further reference to them. It is

the settled rule in England and of every state in this country where equity practice prevails.

I would refuse the injunction for the further reason that the complainants have not suffered irreparable injury, nor are they threatened with any. The only injury of which they complain is that they are compelled to pay a few pennies of toll when they travel over this three and a half miles of turnpike. It may amount to, perhaps, from one to five dollars per year. As an offset to this, they have a good macadamized road at all seasons, in place of a road which the master finds is almost impassable much of the year. In addition, they are relieved from the payment of the taxes necessary to keep the road in order, which the master finds are the full equivalent of the tolls paid. Where, then, is the irreparable injury which justifies the exercise of the extraordinary power of injunction?

It is a familiar rule in equity that a chancellor will never grant an injunction, when by doing so he will inflict a greater injury than the one sought to be redressed. In such case, the unbending rule is, as the authorities all show, to leave the parties to their remedies at law. It is a grave mistake to suppose a court of equity will always enforce a legal right. It will only do so, where there is a strong equity, an irreparable injury, and the absence of an adequate remedy at law. We have seen the trifling character of the injury, and the inexcusable delay in invoking the aid of chancery: what is the injury which this decree inflicts upon the defendants? They have expended about twenty thousand dollars in the construction of this little piece of road. Of all the inhabitants of that township, these plaintiffs are the only ones who complain; and we have the right to assume that all the others are satisfied to pay their tolls, and glad to have a passable road to travel. This injunction practically destroys the capital of the company. The complainants can now use the road free of tolls which their neighbors have made at this large expense. Moreover, they are relieved of their share of the annual expense of keeping it in order. It may be considered a thrifty operation to delay the filing of their bill until the turnpike was secured, and thus gain these considerable advantages over their neighbors, but I confess I am unable to see any equity which commends this case to our favorable consideration. There are cases where the equity powers of the court, judiciously

exercised, are useful and beneficent; but a court can exercise no more dangerous power than equity misunderstood.

But I would affirm this decree upon the merits. The Bird-in-Hand Turnpike Company, appellee, was chartered under the act of .1874, to construct a turnpike of about three and a half miles in length in Lancaster county. The termini are given, but not the route to be taken. It is an admitted fact that between the termini there was an old country road, and that said termini were both on this road. It further appears from the plan submitted that this road is almost as straight as a surveyor could run a line; a single deflection, so slight as to be barely discernible, appearing upon it. The company occupied this road, macadamized it, thus converting it into a turnpike, and erected gates for the purpose of taking toll. I may here be excused for making a reference to the master's findings of fact, as they are practically ignored in the opinion of the court: 128 Pa. 621. I quote from his report:

1. "That the old Philadelphia road, in the summer season, when not rainy, was a good road, with easy grade, with but few exceptions.

2. "That at other seasons, from the late fall until some time in the spring, a period running from four to six months, the road was at times almost impassable, if the period was rainy, by reason of the soft and miry character of its bed, when the road would be badly cut up; and then, when the ground would be frozen, was hard, rough, and very difficult to travel over.

3. "The road is located in one of the most thickly populated parts of Lancaster county, and has a large amount of travel and hauling over it from all surrounding points. The Pennsylvania railroad has a prominent station and warehouse at Bird-in-Hand, close to its eastern terminus.

4. "The line adopted for the pike is very nearly direct between the termini, is on the bed of the old Philadelphia road, and along its entire route interferes with no private property.

5. "Draft No. 2 and the evidence shows it to be .the only feasible, reasonable, and practicable route between the termini. Any other route would have diverged either to the north or to the south. The character of the surrounding country on the south is hilly near the creek, soft, and the hills steep. Near the eastern terminus it would meet the railroad, where there is a

fall of about twelve or fourteen feet. On the north the railroad (Pennsylvania) would be met at several places, to be crossed above or under grade; at Mill creek a dam to be crossed, and from that eastward to the terminus, low ground, and would have been exceedingly injurious to private property.

6. "The change in the road from a highway to a turnpike will not work great and irreparable injury to the plaintiffs and others using said road. The pike gives a good and substantial road, ready for all uses, in all seasons of the year. It works no injury or damage to any one. The only change the turnpike makes is the substitution of tolls for taxes, and thus throws the burden of maintenance upon all who use it, without regard to residence, while as a public highway that burden must be met by the inhabitants of the township through which it passes.

7. "The change in the old road, from a public highway passing through a rural district to a turnpike, makes no change in the use of the road. The turnpike will be used for the same purposes and by the same modes of intercommunication as the old Philadelphia road had been."

These findings of fact have not been shown to be erroneous; on the contrary, they are fully warranted by the evidence.

The opinion of the court holds that there is no express power in the charter to appropriate the old road, and that no such power is to be implied. It is conceded that no authority is given in terms by the charter to occupy the road, nor do I see how it is possible under the act of 1874 to insert such a clause. The most that can be expressly granted under that act is the power to construct a turnpike road between designated termini. It is fair to assume that said act authorizes and was intended to authorize the construction of such roads in the manner they have hitherto been constructed in this commonwealth. A turnpike is merely an ordinary country road, macadamized and rendered fit for travel at all seasons. I have knowledge of many turnpike roads in the counties around Philadelphia, where they are perhaps more numerous than in most other sections of the state, and they were all laid upon the beds of public roads. The pamphlet laws are full of charters granted by the legislature for the last one hundred years, and in very many instances no power is expressly given to occupy a public road. For obvious reasons, such grant was

Opinion Dissenting.

never considered necessary. Every one who has any practical knowledge upon the subject knows that turnpikes never parallel traveled public roads. If they did, the tolls would not pay the gate-keepers, as all the travel would avoid the pike, except when the dirt road was in bad condition from the action of rains and frost. Hence the very purpose of a turnpike charter is not to construct a new road, or parallel an old one, but to occupy an old road, and improve it for the public travel. As some recompense for the outlay thus involved, the law permits the company to charge a moderate amount of toll. It is rarely compensatory. It is only in favored localities, where the material for its construction and repair are conveniently at hand and to be had for the asking, that the stockholders receive any return for the outlay. In those portions of the state with which I am familiar, a turnpike is regarded as a great boon by the inhabitants, and with the present active interest and feeling in favor of improved roads, the complaint of these appellants sounds strangely. While the fact that no such point has been made in this state heretofore, since the foundation of the government, is not conclusive, yet it shows very clearly the view taken of it by the common sense and judgment of the people.

What, then, is the effect of a power to construct a turnpike between designated termini? Upon whom is the power devolved to locate the route? Is it the directors of the company, or the Court of Common Pleas of Lancaster county? The state has fixed the terminal points; for, although this charter was taken out under the act of 1874, its effect is precisely the same as though it had been granted directly by the legislature: Cochran v. Arnold, 58 Pa. 399. The termini are in the road; the most direct and the only practicable route, as found by the master, is upon its bed. To deny it the right to so locate it, is to deny it the right to build it at all, and to destroy its franchise. It is not, and ought not to be required to do impossible things, or anything that is not practicable, and whenever we speak of what is practicable, we must take into view the character of the thing proposed. It will not do to measure a little turnpike road, three miles and a half long, which is being constructed by a few farmers in an attempt to better a very bad piece of road, by the same standard which we apply to a great railroad

Opinion Dissenting.

corporation. What would be reasonably practicable for the latter, with its millions of capital, might be wholly impracticable for the former. For this reason I have not referred to Pennsylvania R. Co.'s App., 93 Pa. 150, and other similar cases. I do not regard them as applicable. While it is no doubt possible to construct this road upon another route, it requires but a glimmering of common sense to see that it is not practicable. Aside from the land damages, the cost of such construction would prevent it; and if it could be done, it would parallel another road, and be of no use to its builders.

This court has decided in numerous instances, so numerous that the principle is so familiar as scarcely to need a reference to the cases, that where the state grants a charter to a railroad company, has fixed the terminal points, but not the route, the board of directors of such company may locate the road, and, when not restrained by the charter, may occupy a public road or street; and such discretion is not reviewable, except for a gross abuse. It is sufficient to refer to Commonwealth v. Railroad Co., 27 Pa. 339; Cleveland etc. R. Co. v. Speer, 56 Pa. 325. If an implied power exists in a railroad company to take a public road, I am at a loss to understand why it does not exist in the case of a turnpike company, especially when, as I have endeavored to show, the very object of such a charter, in nearly every instance, is to macadamize a road already in existence.

A point was made at the argument, and pressed with much vigor, that this company had taken a valuable county bridge, on the line of its road, appropriated it to its own use, and charges tolls thereon. This hardly rises to the dignity of an argument. The company has not taken the bridge, nor has it ever attempted to charge bridge toll; and I doubt even their right to include it in the mileage for which tolls are charged. But even if this right be conceded, the toll for each person passing over it would not probably exceed the sixteenth part of a penny, not sufficient to keep it in repair. If it is destroyed by any accident, the turnpike company must either rebuild it, or wholly abandon its property and franchises. The county does not complain of this "outrage," for obvious reasons, and I do not see that the appellants have any occasion to.

The building of this turnpike has not changed the use of the county road. It is still open for travel for carriages and teams,

Opinion Dissenting.

in a greatly improved condition. The appellants are required to pay a small amount of toll, it is true, but they have the precise equivalent of this in the changed character of the road. This is the principle upon which turnpike charters are based, and it is a sound one. In addition to this, the appellants, as taxpayers, are relieved of their proportion of the expense of keeping the old road in repair.

It is to be presumed, when the legislature granted the power to construct this road, it intended to give all the power usual in such cases, and which has been exercised from time immemorial. That I am not mistaken as to the extent of that power, or at least the common understanding of it, will appear from the fact stated at bar, and not denied, that in nearly all of the thirty-seven turnpike charters granted under the act of 1874, and in the same terms, the roads have been constructed on public roads then in existence. The representatives of nine of these companies have joined in the request for this re-argument. If this judgment is to stand, these corporations must be seriously embarrassed. In every township in the state there can always be found one man to oppose all public improvements. It is not necessary that he should hold lands adjoining the road, or any real estate whatever. He need not even be a taxpayer. It is sufficient that he travels the road once a year with his mule, to invoke the extraordinary powers of a court of equity.

In view of the attenuated thread of equity which runs through this case, the delay of the complainants in filing their bill, and the great mischief which this injunction will work, I would have affirmed the decree of the court below, and left the complainants to their remedy at law.

Mr. Justice GREEN noted his concurrence in the foregoing dissenting opinion.