## Cochran *et al. versus* Arnold *et al.*

1. By the Acts of April 16th 1846, May 4th 1852, and April 12th 1858 (Amendment), it is the right of parties to strike the names of either plaintiffs or defendants, when there is allegation of mistake either in fact or law.

2. Locke *v.* Dougherty, 7 Wright 88, explained.

3. The validity of a corporation formed under the Manufacturing Law of April 7th 1849, cannot be inquired into collaterally.

4. Until the franchises of such corporation have been adjudged by proceedings by the Commonwealth not to exist, it is a corporation *de facto* at least.

5. Patterson *v.* Arnold, 9 Wright 410, overruled.

6. An action for fraud will lie against those who certify falsely for the purpose of obtaining a charter.

7. Parties who contract with a corporation as such, cannot deny its corporate existence.

8. Where parties contracted with a corporation knowing that its certificate was erroneous or fraudulent, they cannot allege that they were injured.

May 5th 1868.　Before THOMPSON, C. J., STRONG, READ, AGNEW and SHARSWOOD, JJ.

Error to the Court of Common Pleas of *Lancaster county:* To May Term 1868, No. 48.

This was an action of assumpsit, to April Term 1860, by J. Harvey Cochran and Winfield S. Russell, trading as Cochran & Russell, against Gideon W. Arnold, Thomas Baumgardner, David Longenecker and eighty-four others, "surviving partners of the firm lately doing business under the name of ' Conestoga Steam-Mills.' "

A number of the defendants, including Longenecker, were not served with process.

The plaintiffs' declaration was for goods sold and delivered, for which three notes had been given in the name of the " Conestoga Steam-Mills," each signed by F. Shroder, president; the first dated November 1st 1856 for $1863.25; the second of same date for $1862.74; the third dated November 5th 1856 for $3139.08.

The plaintiffs gave in evidence the books of the company, showing the existence from about August 1st 1845 of an association for the establishment of a cotton factory, &c.; that, July 2d 1849, at a meeting at which David Longenecker, Thomas Baumgardner and others were present, it was resolved to accept a charter under the General Manufacturing Law, with a capital not exceeding $500,000, in shares of $50 each; also showing the connection of the defendants with the company, and other matters not material to state.

They also gave in evidence the certificate of association by five members of the company, two of whom were Thomas Baumgardner and David Longenecker, dated December 24th 1849, under the Manufacturing Law of April 7th 1849, regularly filed and recorded in the recorder's office of Lancaster county, December

26th, and in the office of the secretary of the Commonwealth, December 28th 1849. It was therein certified that under the corporate name of the Conestoga Steam-Mills they intended to prosecute the manufacture of cotton goods, &c., in Lancaster city, for the period of twenty years; that $500,000 of capital stock had been subscribed in shares of $50 each, of which $350,525 had been actually paid in, with the names and residence of the subscribers, and the directors who were the signers of the certificate.

They further gave evidence from the minutes that at a meeting of the company, January 7th 1850, it was resolved that the proceedings of the five members who procured the incorporation, be ratified and approved; and that upon a transfer by them " of the proper amount of shares to the several stockholders according to the provisions of the said act, this association is hereby declared, with all its estate, property and .rights whatsoever, to be merged into the corporation of the Conestoga Steam-Mills."

" That the former president, and the president for the time being, are hereby authorized and directed to convey to the Conestoga Steam-Mills; now incorporated, all land or real estate, the titles for which they may respectively hold to them and their heirs respectively in trust for the use of the association, under the articles of agreement of the 1st of August 1845.

" The chairman then announced that by the passage of the foregoing resolutions this association of copartnership was merged in the ' *Corporation* of the Conestoga Steam-Mills,' and had no further legal existence."

The defendants admitted that, at the date of the certificate for the procuring of the charter of the Conestoga Steam-Mills, there was no cash paid in by the gentlemen who signed the certificate, but the $351,525 which they certified were paid in, consisted of subscriptions to the capital of the partnership of the Conestoga Steam-Mills, and had been paid into that partnership from the commencement of its business in July 1845 until the date of the certificate, December 24th 1849, and the same had been invested from time to time as received, in the real estate, machinery, stock in trade, &c., of the business, which, with the cash, if any, and credits on hand at the date of the certificate, represented the $351,525.

The plaintiffs admitted that all the facts admitted above were known to them, and that the business of the company up to the time of filing the certificate had been prosperous, and its capital whole.

The plaintiffs then moved to strike off the names of all the defendants except Thomas Baumgardner and David Longenecker.

The motion was overruled.

They then renewed the motion with the allegation that the

[Cochran v. Arnold.]

others were included by mistake; defendants denying that there was any mistake.

The motion was overruled. Bills of exception were sealed to these decisions of the court.

The plaintiffs requested the court to charge the jury that the plaintiffs are entitled by law, under the evidence in the case, to recover their claim of Thomas Baumgardner, and that the jury must find in favor of the plaintiffs against Thomas Baumgardner.

The defendants requested the court to charge the jury that, under the pleadings and evidence in this case, the plaintiffs are not entitled to recover, and that the verdict should be for the defendants.

The court charged: "The plaintiffs having failed in establishing their claims against the defendants in these suits, and the court having overruled the motion made by the plaintiffs to strike off the names of all the defendants except Thomas Baumgardner and David Longenecker, two of the defendants, the defendants are entitled to your verdict; being of opinion that the plaintiffs are not entitled by law, under the evidence in the case, to recover their claim of Thomas Baumgardner; negative the proposition also presented by the counsel for plaintiffs, that the jury must find in favor of the plaintiffs against Thomas Baumgardner in the suit. We also affirm the point made by the defendants' counsel that, under the pleadings and evidence in these cases, the plaintiffs are not entitled to recover, and that the verdict should be for the defendants."

The verdict was for the defendants. The plaintiffs took a writ of error. The refusal of the court to strike off the names of the defendants and the charge of the court were assigned for error.

*J. E. Heister* for the plaintiffs in error.—As to the amendment— Act of April 12th 1858, § 1, Pamph. L. 243, Purd. 47, pl. 4; Good Intent Co. *v.* Hartzell, 10 Harris 277; Downey *v.* Garard, 12 Id. 52; Kaylor *v.* Shaffner, Id. 489; Druckenmiller *v.* Young, 3 Casey 97; Act of April 16th 1846, § 2, Pamph. L. 353, Purd. 46, pl. 2; Wood *v.* Philadelphia, 3 Casey 502; Everhart *v.* Railroad, 4 Id. 340; Walthour *v.* Spangler, 7 Id. 523; Steffy *v.* Carpenter, 1 Wright 41; Rangler *v.* Hummel, Id. 130; Academy *v.* Robinson, Id. 210; Hite *v.* Kier, 2 Id. 72; Jackson *v.* Lloyd, 8 Id. 82; Shollenberger *v.* Seldonridge, 13 Id. 83; Philadelphia Association *v.* Wood, 3 Id. 73; Locke *v.* Daugherty, 7 Id. 88; Patterson *v.* Arnold, 9 Id. 410. As to the charge of the court: Mansfield Iron Works *v.* Wilcox, 2 P. F. Smith 377; Act of April 14th 1851, § 13, Pamph. L. 615, Purd. 770, pl. 1.

*O. J. Dickey* and *T. E. Franklin*, for defendants in error.—

8 P. F. Smith—26

[Cochran *v.* Arnold.]

Whether the "Conestoga Steam-Mills" is a valid corporation cannot be questioned collaterally: Act of April 7th 1849, Pamph. L. 653, Purd. 689; June 14th 1836, § 2, Pamph. L. 621, Purd. 832, pl. 2 (Quo Warranto); March 21st 1806, § 13, 4 Sm. L. 332, Purd. 41, pl. 5; Angell and Ames on Corp. § 94, 777, and authorities cited; Wright *v.* Shelby Railroad, 16 B. Munroe 4; Bank of Circleville *v.* Remick, 15 Ohio 322; Patterson *v.* Arnold, *supra;* Jones *v.* Dana, 24 Barb. Sup. C. 402; Stedman *v.* Evelath, 6 Metc. 114; Falconer *v.* Campbell, 2 McLean 195; Abbott's Nat. Dig. "Corporations," pl. 13.   The defendants are estopped, having been cognisant of the facts on which they rely to set the charter aside: Cathcart *v.* Robinson, 5 Peters 280; Starry *v.* Arden, 1 Johns. Chan. Rep. 261; Jackson *v.* Town, 4 Cowen 603; Lancaster *v.* Dolan, 1 Rawle 246; Foster *v.* Walton, 5 Watts 378.   The plaintiffs dealt with the corporation as a corporation and cannot *imply* a contract with the defendants Fay: *v.* Noble, 7 Cushing 188; Locke *v.* Daugherty, 7 Wright 88; Collyer on Partn., § 725.

The opinion of the court was delivered, July 2d 1868, by

STRONG, J.—The Act of Assembly of March 21st 1806, relative to amendments, is imperative in its directions.   It declares that a plaintiff shall be permitted to amend his declaration or statement in the cases for which it makes provision.   But the language of the later acts is different.   The Act of April 16th 1846 confers upon courts power to permit amendments of the record, when it shall appear to them by any sufficient evidence that a mistake has been made in the Christian or surname of a party.   So the Act of May 4th 1852, empowers the courts to permit amendments in any stage of the proceedings, by changing or adding the name, or names, of any party whenever it shall appear to them that a mistake or omission has been made in the name or names of any such party.   And the Act of April 12th 1858 directs that the Act of 1852 shall be so construed as to authorize the said courts when, by reason of there being too many persons included as plaintiffs or defendants, by mistake, the cause is prevented from being tried on its merits, to permit an amendment by striking out from the suit such persons as plaintiffs or defendants.   All these acts might have been regarded as merely vesting in courts discretionary powers.   They are in terms permissive.   Such amendments are to be allowed only when there has been a mistake, not barely the assertion of one, and the court is to judge of its existence.   There is more reason why a plaintiff should have a legal right to amend his proceedings, when he seeks only to cure an informality, than when the amendment he desires is so vital as is a change of parties.   In the case now before us the plaintiffs asked leave to strike off the names of nearly ninety

[Cochran v. Arnold.]

defendants, leaving only two, and that after the entire evidence had been submitted. Clearly, this would have been a substantial change of the cause of action, which was originally assumpsit upon an alleged joint contract. Had the amendment been allowed, its effect would also have been to deny to the defendants stricken off a remedy for their costs, and that after the other defendants had been deprived of their testimony. And there was no evidence offered of any mistake in having joined so many as defendants in the writ. Were, then, the Acts of 1846, 1852 and 1858 to be construed as they might have been, this would have been a very proper case for refusing the amendment proposed. But under the construction that has been given to them, it would seem that the amendment should have been allowed. In Kaylor v. Shaffner, 12 Harris 489, Lewis, C. J., said, "When the plaintiff by mistake, either of law or of fact, brings an action for his use in the name of one who has no title to support it, the Act of 1852 fairly applies to the case, and whenever it shall appear to the court that such a mistake has actually occurred, it is the duty of the court to correct it." This was holding the Act of 1852 to be more than the grant of a discretion. So in Wood v. The City of Philadelphia, 3 Casey 502, a judgment was reversed because the court below refused to allow an amendment in the names of the parties, and Woodward, J., said: "The power to permit amendments in the names of parties is conferred upon the courts by the second section of the Act of April 16th 1846, and the grant of the power implies the duty to exercise it in a proper case. The mistake, says the act, may be shown by any sufficient evidence, and that which ought to satisfy is sufficient." And in Rangler v. Hummel, 1 Wright 130, where a co-plaintiff was stricken from the record, the present Chief Justice said, "We have so often decided under our statutes of amendments, that parties might be stricken out or added whenever this was necessary to a trial on the merits of the case, that we do not deem it necessary to cite authorities on the subject. This is the plain requirement of the Act of May 4th 1852, as construed by the Act of April 12th 1858. Whenever the rights of a party are liable to be defeated by having joined too few or too many plaintiffs or defendants, the amendments may be made. In such circumstances the fact of mistake is hardly debateable; it will be presumed, if without them the merits may not be fully tried." Most of the cases, it is true, relate to amendments which have been allowed in the lower courts, and we have sanctioned them. Wood v. Philadelphia is, however, an exception. So most of the cases relate to amendments of plaintiffs on the record, but the Act of 1858 places plaintiffs and defendants on the same footing, and the cases cited make no distinction. If the acts are to be regarded as compulsory, it is as much a right of a plaintiff to strike off names of defendants, as it is to make

[Cochran *v.* Arnold.]

changes in plaintiffs. Locke *v.* Daugherty, 7 Wright 88, justified a refusal of an amendment striking out the name of one of two defendants in an action of assumpsit, but the decision was grounded upon the special circumstances of the case. There was no allegation of mistake, and there had been an arbitration and an appeal. It was not intimated that what had been previously decided, namely, that under the Acts of 1852 and 1858 an amendment striking out the names of parties, either plaintiffs or defendants, is a matter of right, is not the law. We should, therefore, be constrained to rule that there was error in the refusal to permit the plaintiffs to amend by striking out the names of all the defendants except Longenecker and Baumgardner, and to reverse the judgment, were it not for the fact that, in our opinion, the amendment, had it been allowed, would have availed the plaintiffs nothing.

The action was assumpsit brought against a large number of persons, charging them as partners in the purchase of cotton alleged to have been sold and delivered. The defendants were stockholders of a company called Conestoga Steam-Mills, which claimed to have become a corporation in 1849, under the General Manufacturing Law of that year. In 1849 a certificate of association for corporate purposes was made out and recorded. It set forth all that the law required. It was entirely regular on its face. A certified copy of it was filed in the office of the Secretary of the Commonwealth. Ostensibly the requirements of the law were fully met. From that time until after the cotton was sold, the corporation had, if not a legal, at least a *de facto* existence, and it carried on business as such. In November 1856 the plaintiff sold a quantity of cotton to it and took the promissory notes of the corporation for the price, with a full knowledge of the mode of its constitution, and of what is now alleged to have been a failure to comply with the requisitions of the Manufacturing Law for the procurement of a charter. They now sue those who were stockholders of the company at the time the cotton was purchased, and claim to recover against them individually upon the ground that the original certificate for incorporation, though apparently regular, was illegal and void because it did not set forth that the capital paid in was at the time invested in mills, machinery and other property adapted to the purposes for which the corporation was proposed to be organized. This they contend renders the charter a nullity, and justifies them in treating the sale as having been made to the defendants as partners. The case rests therefore upon the assumption that because the corporation was so irregularly constituted that the Commonwealth might have called in question its legal existence, the plaintiffs may attack it and disprove its lawful being.

But the assumption is unwarranted. The plaintiffs are not at

[Cochran *v.* Arnold.]

liberty to assert in this action that the corporation was not lawfully formed. Though formed under a general law, it is as against all the world but the Commonwealth, as completely and effectively a corporate body, as if it had been created by a special Act of Assembly and by letters patent. The Act of April 7th 1849 prescribes what shall be the legal proof of the existence of such a corporation. That proof is a certificate of certain things made out as required, recorded in the proper county, with a certified copy of the certificate filed in the office of the Secretary of the Commonwealth, endorsed by him and then retained by the company. The law declares that when the certificate has been thus recorded and filed, the persons who have signed and acknowledged it, and their successors, shall be a body politic and corporate, in fact and in law. No distinction is made between the effect of such a mode of incorporation and the effect of any other mode. If the certificate recorded and filed is false, or if the law has in any particular been violated, the Commonwealth has a remedy by writ of quo warranto, as it would have in any other case where corporate privileges have been obtained by fraudulent means or in an illegal manner. But until the franchise claimed and used has been directly adjudged not to exist, there is a corporation *de facto* at least. If there is anything settled it is that the corporate existence of a corporation *de facto* cannot be inquired into collaterally. Upon this subject the authorities are too numerous to admit of citation. The plaintiffs do not deny the principle as a general rule, but they contend that it is not applicable to corporations of this character, to those organized by the corporators themselves under a general law, and for support in this position they rely upon Patterson *v.* Arnold, 9 Wright 410. Such is the doctrine advanced in that case. But the decision then made was that of a bare majority of the court. It does not profess to rest on a single authority. It is sustained by none, for it is in conflict with the steady course of decision elsewhere, wherever statutes exist, similar to ours of 1849. Very little attempt was made to sustain it by reason, and if it is the law it must work great confusion, and lead to intolerable mischiefs. Happily, if it was mistakenly made, we may now correct the mistake without harm to any one.

There is no reason that can be given for such a distinction as is claimed between a charter obtained under the Act of 1849, and one obtained under a special Act of Assembly. In each case corporate power is obtained by act of the corporators, under restrictions imposed by law. When an act authorizes letters patent to issue after a certificate by commissioners appointed to receive subscriptions to the capital stock, that a certain amount has been subscribed, and a certain proportion paid in, the certificate may be false, but nobody ever supposed that the charter obtained by the false certificate is void, or that it may be attacked

collaterally. Why then should it not be so in case of a charter under the Act of 1849 ? How much more is a charter secured under that act the work of the corporators than is one obtained in the other mode ? How much less is the organization under the conduct of the state ? Yet that it is less is the only reason attempted to be given in Patterson v. Arnold, why the charter in the one case should be open to collateral attack, and in the other assailable only directly by the Commonwealth.

If we look at the consequences of permitting one who deals with a corporation formed under the General Manufacturing Law to deny that it ever had any legal existence, or to call in question its right to exercise corporate powers or enjoy corporate privileges, we shall find them to be no less mischievous than such as would follow the doctrine that any corporation may be collaterally attacked, by one who has given credit to it, that it is not immunity to its shareholders. Indeed the mischiefs of such a doctrine are the same, whatever may be the mode of obtaining corporate existence. By one jury a charter may be set aside. By another it may be sustained. One creditor may sue the corporation as such, obtain a judgment and sell its land, himself becoming the purchaser. Another creditor may sue the corporators alleging that their charter is null, furnishing no immunity to them. He may obtain a judgment and sell the same land to another purchaser, as the property, not of the corporation, but of the stockholders. In such a case which purchaser would hold the title ?

Again, new stockholders may come in, totally ignorant of any fraud or mistake in making out the certificate. Are they to be charged individually because there was a secret vice in obtaining corporate being ? That would be monstrous. It would render the manufacturing law a thing to be avoided, though it expresses a cherished policy of the legislature. Yet if a charter can be shown invalid by collateral attack at the suit of a creditor, why are not new stockholders who have come in after the birth of the corporation equally liable as partners, or joint contractors with all the original stockholders? Can the charter be effective, and yet not effective ? In Patterson v. Arnold it seems to have been thought a charter may be good as to some stockholders and a nullity to others. What confusion must this produce ? Some may be sued as partners, and others through the corporation, and under judgments obtained executions be levied upon the same property. Or all the original stockholders may go out and give place to successors. Then that which was incurably vicious, because an usurpation upon the Commonwealth, has become good. It is impossible, however, that a charter can be good as to some stockholders, and bad as to others. Every one has an interest in the property of his associates invested in the common stock. Such is his corporate right. If that property can be withdrawn by

action against his associates individually, the charter ceases to be to him all that it purports to be.

It is said that those who certify falsely for the purpose of obtaining a charter are guilty of fraud. Doubtless this is so. There is a fraud upon the state. If it be also a fraud upon creditors, the law furnishes a remedy. An action will lie for the fraud. But to deny the corporate existence of a *de facto* corporation, and to hold as partners those who were guilty of fraud in obtaining the charter, is to confound an action *ex contractu*, with one essentially for a tort.

It has already been said that Patterson *v.* Arnold is unsustained by authority. General laws, much like our Act of 1849, exist in many of the states, and whenever the question has come up it has been ruled that corporations formed under them, like all others, are to be regarded as such until their right is questioned by the state. The question cannot be raised collaterally whether they are lawfully such. In Jones *v.* Dana, 24 Barb. Sup. C. Rep. 402, the court said, " The statute is explicit and leaves no room for construction. It makes the copies of the charter and certificates filed in the office of the county clerk, the authority of the corporation to commence business and issue policies, and makes them evidence for and against the company ; that is, evidence of the authority to act as a corporation. The legislature having said what acts shall give the company corporate powers, and what shall be the evidence of those acts, as well for as against the company, courts cannot, at the instance of third persons, go behind those acts, and the prescribed evidence of them, for the purpose of determining the validity of the corporation, and make the decision, perhaps, depend upon some mistake or accident from which no one has received or can receive any injury." And, again : " The only remaining question is, whether the plaintiffs have shown the Utica Insurance Company, acting under a charter, or an authority apparently valid, and really so, unless impeached by something outside of the record evidence of the corporate existence, and depending upon proof *aliunde*. If they have, and have thus furnished primâ facie evidence of the incorporation, they cannot go behind that evidence to show that it was got up in fraud or mistake, or irregularly brought into existence." All this was said in reference to a corporation that came into being under an act very similar to ours. To the same effect is Stedman *v.* Eveleth, 6 Metcalf 114, and Baker *v.* Backus, 32 Ill. 111. I know of no case except Patterson *v.* Arnold, in which a different doctrine has been advanced. It was not then competent for the plaintiffs in this action, after having contracted with the Conestoga Steam-Mills as a corporation, to deny its corporate existence. To all the stockholders its charter furnished an immunity against its creditors. The plaintiffs, therefore, would have had

[Cochran *v.* Arnold.]

no cause of action against any of the defendants, had their amendment been allowed.

There is another reason why there could have been no recovery. ⸍ʰe certificate for the incorporation was erroneous or fraudulent, the plaintiffs knew it when they sold the cotton. It was not for them afterwards to say it was a wrong done to them. It is needless, however, to enlarge upon this. It is enough that they were not at liberty to call in question the validity of the charter.

The judgment is affirmed.