HARRISON v. PHILADELPHIA CONTRIBUTIONSHIP FOR INSURANCE OF HOUSES FROM LOSS BY FIRE.

(Circuit Court, E. D. Pennsylvania. June 4, 1909.)

No. 99.

1. INSURANCE (§ 226*)—MUTUAL COMPANIES—CONTRACTS WITH MEMBERS.

By the fundamental law of a fire insurance society organized in 1752, comprised in its deed of settlement and subsequent charter from the state, every person insuring therein was required to deposit a sum proportioned to the amount of his policy, and become a member of the society during the continuance of his policy, on the expiration of which without a loss his deposit, subject to certain deductions, was returned. By an amendment adopted in 1836 it was provided that all policies thereafter issued should be made to continue in force for an unlimited period, but that the society should have the right on 30 days' notice to cancel any policy and return the deposit, or the insured might on notice surrender his policy and withdraw his deposit less 5 per cent., and such provisions were incorporated in all subsequent policies. *Held*, that a policy thereafter issued was subject to such provisions as a part of the contract, and that the holder had no standing to enjoin the society from canceling the policy and terminating his membership on the ground that the amendment of the deed of settlement was ultra vires.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 498; Dec. Dig. § 226.*]

2. CORPORATIONS (§ 29*)—CORPORATE POWERS—PERSONS ENTITLED TO QUESTION.

Under the law of Pennsylvania, the validity of a corporate charter or of a particular power apparently conferred thereby cannot be inquired

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

into collaterally, but must be the subject of direct attack by the commonwealth.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 78; Dec. Dig. § 29.*]

In Equity.   On final hearing.

R. Mason Lisle, for complainant.
W. W. Montgomery and John G. Johnson, for defendant.

J. B. McPHERSON, District Judge. This controversy was heard upon bill and answer. The facts are not in dispute, and may be stated as follows: In March, 1752, certain persons in the city of Philadelphia entered into a mutual agreement or deed of settlement of which the object appears in the following paragraph:

"Whereas the Insurance of Houses from Loss by Fire hath, where the same has been practised, proved very useful and advantageous to the Publick:

"Now know ye, that we the said Subscribers hereunto, as well for our own mutual Security as for the common Security and Advantage of our Fellowcitizens and Neighbors, and for the promoting of so great and publick a Good as the Insurance of Houses from Loss by Fire, upon the most equal Terms and apart from all Views of private or separate Gain or Interest, have of our own Motion offered each to the other, and have unanimously resolved and agreed, and by these Presents do covenant, promise and agree for ourselves severally and respectively, and for our several and respective Executors, Administrators and Assigns, to form, erect and settle an Office, Society or mutual Contributionship, by the Name or Stile of the Philadelphia Contributionship, for the Insuring of Houses from Loss by Fire, and to be and continue Contributors unto, and equal Sharers in the Losses as well as the Gains and Advantages arising, accruing and happening in and by the same, upon the Terms, and according to the Articles and Agreements, and subject to the Provisions and Conditions hereinafter mentioned."

Every subscriber then or thereafter, his executors, administrators, and assigns, "being allowed to be and continue as Persons insuring in this Society, as hereinafter is mentioned and provided," were to be "Members thereof, to all Intents and Purposes, and shall be concluded by the Covenants and Agreements herein contained, and shall have and bear his, her and their proportionate Part and Share of all the Profits and Advantages as well as of all the Losses and Charges arising in and by the same, for and during the respective Terms in his, her or their respective Policies." The term of insurance was to be for seven years. The cost of insuring was in part provided for by a small preliminary payment, but chiefly by the deposit of money in accordance with the following paragraph:

"Every Person insuring shall deposite in the Hands of the Treasurer, as a Pledge for the Performance of his Covenants, a certain Sum for every One Hundred Pounds insured, according to the greater or less Hazard of the Building on which the same is insured, agreeable to the Table hereto annexed. Which Deposite Money shall be returned to the Person or Persons so depositing it, his, her, or their Executors, Administrators or Assigns, at the Expiration of his, her or their respective Policies, together with a proportionable Dividend of the Profits in the meantime, after Deduction of Losses and incident Charges only. Provided, and it is hereby agreed, that for the better and more certain adjusting the accounts of the Society, the said Deposite Money shall be demanded within one Year next after the Expiration of each respective Policy: And in Default thereof, the same Deposite Money shall become forfeit, and be sunk to the Benefit of this Society."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

All policies "at their respective Expirations, and the returning or accounting for the Deposite Money and the mean Profits, shall be delivered up to this Society to be cancelled." It was further provided that:

"All and every Person or Persons insuring in this Society shall stand and be obliged to pay his, her and their Proportion of all Losses and Charges happening and incurring in and to this Society, and for that Purpose shall sign and execute these Presents: Yet so as no Person or Persons shall be obliged beyond his, her or their Deposite Money, to pay a Sum exceeding one Half the said Deposite, for his, her or their Proportion and Contribution towards the Loss which shall be occasioned by any single Fire that shall happen."

After a loss the directors were to settle a rate of contribution, from which a method of appeal was provided.

"Yet nevertheless it is hereby declared and agreed, that in the mean Time, when such Rate or Rates shall exceed the Deposite Money, all and every the Members of this Society shall be obliged to pay into the Hands of the Treasurer, his, her and their proportionable Parts and Shares of all and every such Rate and Rates, within Thirty Days next after such Publication of the same respectively aforesaid; and in Default of such Payment, he, she, and they, and every of them, making such default therein, shall forfeit double the said Rates; and, neglecting to pay the said Forfeiture ten Days more, shall or may, by the Directors for the Time being, be excluded and debarred all Benefit and Advantage of his, her and their Insurance and Insurances respectively, and all Right to the Stock of this Society, and shall notwithstanding be liable to the Payment of the said Rates, pursuant to his, her, and their Covenants and Engagements in these Presents contained."

The net profits arising by interest or otherwise were to be "divided yearly to every Member in Proportion to his Insurance, for which each Member's Account shall have Credit in the Society's Books, to be paid at the Expiration of their Policies. Contributions to Losses shall likewise be settled yearly, and every Person insuring shall contribute in Proportion to his Insurance. * * *" A general meeting of the members was to be held each year; "and all and every the said General Meetings may, and are hereby declared to have full power to consider, treat of, and determine of and concerning all or any the Matters and Things relating to this Society, and the Support, Preservation and good order thereof, and to alter and amend the present Articles, and make any additional Rules or Articles, for the better and more orderly and successful or satisfactory Management of the Affairs of this Society. At all which Meetings, the Determination of a Majority of the Members present, shall be conclusive and binding on the whole Society."

The deed of settlement contained many other details, which do not seem to be now important.

In February, 1768, the Provincial Assembly incorporated the society, declaring that:

"* * * All and every Person and Persons, who have heretofore subscribed the said recited Articles of Agreement [the deed of settlement], by him, her, or themselves, or by his or their Attorney or Agent, and each and every one, who shall hereafter in like manner subscribe the same, or shall at any Time or Times hereafter insure in or with the said Society, their respective Heirs, Devisees and Assigns, shall be and they, and every of them are hereby declared to be Members of the said Society, and are hereby made a Body Politic and Corporate in Law. * * *"

Among other provisions the charter appointed an annual meeting of the contributors, who were—

"* * * empowered to consider, treat and determine of, and concerning all or every the Matters and Things, relating to the prudent and just Management, and good Order of the said Society; and to establish and confirm all such Articles and Rules, as have been heretofore agreed to, and not ratified and confirmed by this Act, to alter and amend the same, and to make and establish any other additional Rules and Articles, for the better and more perfect Prosecution of the true Intent and Design of the said Society. At all which Meetings the Determination of a Majority of the Contributors present shall be conclusive and binding on the whole Society; provided always, That the said Rules and Articles be not inconsistent with, or contrary to, the Regulations and Establishments made and declared by this Act."

In April, 1810, at a general meeting of the society, the deed of settlement (the details of which had not been seriously disturbed by the charter) was revised, and it was provided, inter alia:

"All persons insuring in and with this Society shall be deemed members of the same during the continuance of his, her, or their interests in their respective Policies."

"IV. Every policy hereafter to be issued by this Society shall be made to continue in force for an unlimited period. But whenever a total loss of the property ensured shall happen, the policy, upon the payment of the said loss or upon the re-building of the property as is hereinafter provided, shall be delivered up to the Society, who shall be entitled to retain the deposit money, and the ensurance shall from thenceforth cease and be of no effect. And it shall moreover be lawful for either the Assured or this Society, at the expiration of seven years from the date of any such policy, or at the expiration of any period of seven years thereafter, to cancel the same, or to withdraw the deposit money, thirty days previous notice being given of an intention so to do. And in case the party assured shall sell the property ensured before the expiration of any such period of seven years, it shall be lawful for him to give up the policy and to withdraw the deposit money upon paying to the Society five per centum upon the amount of such deposit. But in all cases in which the deposit money shall be withdrawn as aforesaid, if it shall have happened during the period such policy has been in force, that the stock of the Society has been lessened by losses, then and in such case a just proportion of all such losses as the interest money has been insufficient to satisfy, shall be first deducted out of the said deposit money."

Assignment of a policy might be permitted by the directors, but—

"* * * in all cases, in which the Directors shall not permit an assignment, or transfer, so circumstanced to be entered, the party entitled to the Policy, shall be at liberty to withdraw the deposit money, paying to the Society five per centum upon the amount thereof."

A general meeting of the members was to take place each year—

"and the said members at every such general meeting shall and may treat and determine of and concerning all matters and things relating to the management of this Society; and they, or a majority of the members met, may alter or amend the present articles, or make any additional articles, for the more perfect prosecution of the design of this Society, provided the same be not contrary to the Act of Incorporation."

On April 11, 1836, at a general meeting of the contributors, certain alterations were recommended by the directors, who stated in their report, that:

"These alterations do not in any respect change the contract at present existing between the Society and the parties Insured except in regard to the return of Deposit money in Certain cases. * * * They are one and all in-

tended to authorize and to effectuate the same contract in future cases rendering it in a few particulars more explicit and adapting its form to the more. Convenient mode of transacting business now undertaken by the office."

Among these alterations or amendments is the following italicized provision, which is of the utmost importance in the present controversy:

"IV. Every Policy hereafter to be issued by this Society shall be made to continue in force for an unlimited period. But whenever a total loss of the property shall happen, the Policy, upon the payment of the said loss or upon rebuilding of the property as is hereinafter provided, shall be delivered up to the Society, who shall be entitled to retain the deposit money, and the insurance shall from thenceforth cease and be of no effect. *And it shall moreover be lawful for this Society, upon giving thirty days' notice, to cancel the Policy, returning the deposit money upon a surrender of the Policy.* It shall also be lawful for the Assured, on giving five days' notice and surrendering the Policy to withdraw the deposit money, allowing a deduction of five per centum thereon. But in all cases in which the Assured shall withdraw the deposit money, if it shall have happened during the period such Policy has been in force, that the Stock of the Society has been lessened by losses, then and in such case, a just proportion of all such losses as the interest money has been insufficient to satisfy shall be first deducted out of the said deposit money."

On June 3, 1856, the defendant issued a policy of fire insurance for $4,500 on certain premises in the city of Philadelphia, the insured having deposited in consideration therefor the sum of $225; and on February 27, 1871, the defendant issued another policy of fire insurance for $7,500 upon other premises in the city, the insured having deposited the sum of $490 as consideration therefor. The plaintiff has succeeded to the rights of the original insured, and was the owner of both policies when this bill was filed. Each policy recites that the insured has become a member of the defendant company "pursuant to the deed of settlement hereto annexed, and having deposited in the hands of the treasurer of the said society the sum of ———— dollars." In consideration thereof the defendant insures a specified sum to the policy holder, his heirs, executors, administrators, and assigns "on the terms, conditions, and provisions in the said deed of settlement and in this policy contained or referred to." As has already been stated, among the conditions contained in the deed of settlement is the foregoing amended article 4 that was adopted on April 11, 1836. This article is repeated in each policy with immaterial omissions and variations. The insurance contracts thus entered into continued undisturbed until September 20, 1907, when the defendant notified the plaintiff of its intention to cancel the policies at the expiration of 30 days, and to return the deposit money, unless the plaintiff would accept a partial reduction of the risk and an increase in the rate with the return of a proportionate part of the deposit. No cancellation has actually taken place, but the bill avers that the company proposes to take this step whenever it may elect so to do. On December 31, 1907, five months before the bill was filed, the assets of the defendant were $5,314,103.14 and the deposit moneys were $625,044, and the plaintiff, averring that his proportion of the deposit money was 1/874 thereof, and that he was therefore equitably interested in the assets in a similar proportion, and averring, further, that the cancellation of his policies and the return of the de-

posit money would deprive him of his interest in the assets and his right to participate in any future profits therefrom, asks for a decree declaring his proportionate interest in the assets, and enjoining the defendant from depriving him thereof, and from depriving him also of his membership in the society.

I have found the facts fully upon which the plaintiff rests his claim to an indefeasible ownership in order to present his case with fairness; and I may add that the true nature of the company, and the rights of its members and policy holders, so far as the controversy might involve these matters, would require consideration, if it were not for one objection to the bill that lies upon its surface and in my opinion is fatal to the plaintiff's case. This objection is to be found in the fact that the claim now set up is in direct opposition to the contracts contained in the policies, and violates a fundamental term of those agreements, and of the company's apparent chartered powers. It is true that the plaintiff attacks the amendment of April, 1836, providing for cancellation on 30 days' notice as ultra vires so far as it refers to returning the deposit money, and thus depriving the plaintiff of his interest in the assets and his membership in the defendant company; but the difficulty in my mind is to discover upon what sound theory of legal or equitable right the plaintiff rests his claim to make such a contention, entirely aside from the fact that he is making a collateral attack upon an apparent corporate power of the society. When he (or his predecessor) approached the defendant in 1856 and 1871 with a proposition for insurance, he found the society transacting business on the terms inter alia set forth in the amendment of 1836. The fundamental law of the corporation contained the provision that cancellation and return of the deposit might be made after due notice. The policy repeated these provisions, and therefore unequivocal notice was given to all who desired the society's protection that only upon these terms would the relation of policy holder or member and insurer be established. It was open to the plaintiff at that time to accept or to refuse these conditions. Conceivably he might have said, as he now says:

"I deny your power to make the amendment which in form you adopted many years ago. If you take me as a member, I shall assert the right to continue my membership, even although you cancel my policy, and I shall demand that you retain my deposit, and pay me profits thereon until I elect to reclaim it."

If the society had accepted him on such a footing, something might be said in favor of considering the argument that is now advanced to justify his claim. But he made no such declaration, either expressly or impliedly. He accepted the policy without demur precisely as it stands, with the condition that is based upon the amendment of 1836; and now, when the company seeks to enforce the condition to which he unquestionably agreed, he tries to evade its enforcement by denying its validity. In other words, he attempts to make a new contract with the defendant, and to make it of his own separate motion against the defendant's will. It is not to the point to say that, if this provision was ultra vires, it was wholly void, and should be treated as if it had never existed. This is merely playing with words. It is impossible so to treat the provision. Void or not void, it did exist in fact. It was,

in fact, adopted by the corporation. It was printed as part of its fundamental law, and it became a clause in each of its policies. No one doubts that the society adopted it in good faith, exercising what was at least a prima facie right of amendment in this particular, and no policy holder has ever questioned its validity until this bill was presented. Good or bad, the amendment was an essential term of the contract between the plaintiff and the corporation, and in my opinion he can no more repudiate it than he can deny the force of any other provision to which he may concede that he can offer no objection. How can it possibly be determined that his policies would have been issued at all if they had not contained this condition? The presumption is that the parties to a contract regard all its conditions' as important; and therefore to permit the plaintiff to request and to receive a policy that contains the condition now attacked, and then to allow him of his own volition to strike it out of the written agreement, is to clothe him with the power to write a new contract to which the mind of the defendant has never assented.

But, apart from these considerations, there is the further objection that the plaintiff is not permitted to assert such a position. If the defendant has overstepped the limits of its corporate authority, if it has undertaken to do what its chartered powers do not allow, there is a supervising authority that may be invoked whose right in the premises (speaking generally) is supreme and exclusive. The commonwealth has the power to control her creatures, and ordinarily it is for her alone to take care that they do not transgress their proper bounds. There are some exceptions to this proposition, but the general rule is I think correctly stated. That the validity of a charter or of a particular power apparently conferred thereby cannot be inquired into collaterally, but must be the subject of a direct attack by the commonwealth, has been often decided in Pennsylvania. Some of the cases are Cochran v. Arnold, 58 Pa. 399; Spahr v. Farmers' Bank, 94 Pa. 429; Freeland v. Insurance Co., 94 Pa. 504; Johnston v. Elizabeth, etc., Ass'n, 104 Pa. 397; Hamilton v. Railroad Co., 144 Pa. 34, 23 Atl. 53, 13 L. R. A. 779. Or, if a policy holder in the society antedating April, 1836, conceives himself to have been injured by the action taken in that year, he may perhaps have a standing to attack the amendment when it is employed against him; but where, as here, a plaintiff has deliberately taken a policy containing the provision in question, he must (in my opinion) abide by the agreement and must stand upon the contract as he chose to make it, and as the corporation was prima facie authorized to execute it.

If this position is correct, it is unnecessary to consider the plaintiff's argument that by paying the deposit money his membership in the society became indefeasible and wholly independent of the fact of insurance; so that, even though his policy should be canceled, he would continue to be a member, entitled to share in the profits and the assets; the right so to continue being altogether beyond the defendant's power.

A decree may be entered dismissing the bill at the costs of the plaintiff.