ATKINS and others *v.* WABASH, ST. L. & P. RY. CO. and others.[1]

## BEERS *v.* SAME.

*(Circuit Court, N. D. Illinois. December 7, 1886.)*

1. COURTS—JURISDICTION—CONFLICT—UNITED STATES CIRCUIT COURTS—RAILROAD COMPANIES—RECEIVERS—MORTGAGE—FORECLOSURE.

A suit to foreclose a mortgage is a local action; and the fact that the United States circuit court, sitting in Missouri, has entertained a bill by a railroad

[1]See Wabash, St. L. & P. Ry. Co. v. Central Trust Co., 22 Fed. Rep. 138, 269, 272; S. C. 23 Fed. Rep. 863, and 25 Fed. Rep. 69, 693.

company owning and operating lines in that state, and in Illinois, and other states, filed by the corporation, for the appointment of receivers, and has, without notice to the Illinois mortgagees, named such receivers, and, in the course of the proceedings, ordered a foreclosure of the entire line, does not operate to oust the United States circuit court sitting in Illinois of jurisdiction of a suit by such mortgagees to remove the receivers appointed in Missouri, so far as the lines in Illinois are concerned, and to foreclose the mortgages thereon. At the time the receivers were appointed in Missouri ancillary proceedings were had in Illinois, and the circuit court there entered an order appointing the same receivers for the property in that state, but in that order the court reserved the power to make such further orders in the premises as might be necessary.

2. RAILROAD COMPANIES—RECEIVERS—ABUSE OF TRUST—REMOVAL.

Courts of equity will protect the interests of the minority holders of mortgages of a railroad company as against the majority, and will remove receivers appointed at the instigation of the majority, where it appears that the receivers are incompetent, and that part of them have interests in other corporations adverse to the interests of the minority mortgagees, and are using their influence and powers as receivers in advancing such corporations, at the expense of the railroad.

3. RECEIVERS—DUTIES—INSOLVENT RAILROAD COMPANIES—WHO SHOULD BE APPOINTED.

Receivers should be impartial between the parties in interest; and stockholders and directors of an insolvent railroad company should not be appointed receivers, unless the case is exceptional and urgent, and then only on the consent of parties whose interests are to be intrusted to their charge.

In Equity. Bill to foreclose mortgage, and remove receivers.

*Henry Crawford,* for complainants.

*Isham & Lincoln, Julian T. Davies,* and *D. H. Chamberlain,* for intervening first and second bondholders.

*Wager Swayne* and *T. H. Hubbard,* for purchasing committee.

*W. H. Blodgett,* for receivers.

*Williams & Thompson,* for trustees.

*C. M. Osborn,* for Chicago & W. I. R. R.

GRESHAM, J. The Wabash, St. Louis & Pacific Railroad Company is a consolidated corporation, owning lines of railway in several states on both sides of the Mississippi river. In the latter part of May, 1884, in form, it filed its bill in the circuit court of the United States for the Eastern district of Missouri against the trustees in the general mortgage covering the corporate property, and against certain railway corporations whose lines it was operating under leases. Upon the filing of this bill the court at once assumed jurisdiction of the entire property of the corporation, and, without notice, appointed as receivers Solon Humphreys and Thomas E. Tutt, who were, or up to that time had been, stockholders and directors; and ordered them to hold and operate the entire railway systems under that court's orders, and the orders of other courts exercising ancillary jurisdiction. The bill appears to have been first presented to the district judge at St. Louis, who declined to appoint receivers; when counsel applied to the circuit judge, who made the appointment at Topeka, Kansas, on the twenty-eighth of May, and the receivers qualified at St. Louis on the twenty-ninth.

A bill similar to the one filed at St. Louis was filed in this court on the 28th, the same day the appointment was made in Kansas, and the day before the receivers qualified at St. Louis. Upon the filing of the bill here, an order was entered, in form, adopting and approving the orders of the court at St. Louis, and appointing the same receivers, and directing them to take possession of all the property in Illinois. This order, and the so-called ancillary proceeding here, concluded thus: "And this court further reserves to itself power to make such further orders in the premises as may seem to be necessary."

After the receivers had been appointed by the court at St. Louis, the trustees in the general mortgage filed a cross-bill to foreclose that mortgage, and later they filed an original bill in one of the state courts at St. Louis to foreclose the same mortgage, which latter suit was removed to the federal court, and consolidated with the Wabash suit.[1] The court at St. Louis, on application, refused to extend the receivership to the cross-bill, or to the consolidated suit. A decree was entered in the consolidated suit foreclosing the general and collateral trust mortgages, and at the sale the property was bid in by a purchasing committee.

With the exception that there was no sale, the same course was pursued at Springfield, in the Southern district of Illinois, as at St. Louis; the proceedings there, however, being ancillary to the proceedings at St. Louis. There was no appearance by any of the trustees at St. Louis until after the receivers had been appointed, and certain orders had been entered authorizing the issue of receivers' certificates.

Atkins and others, in behalf of themselves and other bondholders, filed a bill in this court to foreclose a mortgage executed February 1, 1867, by one of the consolidating corporations, to secure an issue of bonds amounting to $2,601,000, and also to foreclose a mortgage executed May 17, 1879, to secure an issue of bonds amounting to $2,-000,000, of which it is alleged $1,600,000 only were ever issued. The mortgage of 1867 covers the main lines in Illinois, Indiana, and Ohio, except the Chicago Division, the line from Decatur, Illinois, to East St. Louis, and the line from Naples to East Hannibal. The mortgage of 1879 was executed a short time before the consolidation of the companies and their lines east and west of the Mississippi river. This mortgage covers the main system, except the Chicago Division, extending from Toledo to Burlington, Keokuk, Quincy, Hannibal, and East St. Louis, and its operation, prior to consolidation into the Wabash system, was remunerative.

Beers, in behalf of himself and other bondholders of the same class, filed a bill to foreclose the mortgage on the Chicago Division, to secure an issue of bonds amounting to $4,500,000. This mortgage covers 257 miles of railway.

---

[1] Wabash, St. L. & P. Ry. Co. v. Central Trust Co., 23 Fed. Rep. 513.

These bills were filed upon the theory that all the railway property in this state was taken into the custody of this court under the order entered here on May 28, 1884. It is claimed that they are dependent upon and ancillary to the suit of the Wabash Company, and are not, therefore, subject to the test applied to independent original bills. It is urged that they should be treated as petitions *pro interesse suo*, filed in the case in this court. The trustees in the three mortgages which the bond creditors are seeking to foreclose here, the purchasing committee, and the Wabash Company, entered their full appearance to the two new suits. The mortgages of 1867 and 1879, and the Chicago Division mortgage, and 10 others which were executed from time to time by corporations which have become extinct by consolidation, secure outstanding bonds amounting to over $27,000,000, upon which nearly two and a half years' interest is due. The interest in arrear on the first of August last, according to the auditor's report, was about $4,400,000. The bonds secured by the Chicago Division mortgage draw 5 per cent. interest, and the bonds secured by the other 12 draw 7 per cent. It is not denied that the 13 mortgages are valid, subsisting obligations; that the interest is in arrears for more than two years; and that the mortgaged property is an inadequate security. The income arising from the operation of the lines east of the Mississippi river was pledged by the mortgages. The main line east of the Mississippi river, not including the Chicago Division, made, in 1885, over and above operating expenses, $873,925.85, which left, after making a fair deduction for taxes, over $600,000. This money was used in paying losses on non-remunerative lines in the system. On this subject the purchasing committee, in their circular of June 1, 1886, say:

"It is fair to state that many lines of road have been worked which have not paid their expenses, and the amount required above the amount of earnings has been taken from the earnings of these two divisions."

In the two suits which have been brought here, the court is asked to remove Humphreys and Tutt on the ground that they are not fit persons to act as receivers, and appoint some capable, trustworthy person in this case. The decision of this motion renders it necessary to refer somewhat further to the proceedings commenced by the Wabash Company at St. Louis and elsewhere; to the relation of the receivers to that and other corporations; and to the parties interested in, and affected by, the litigation, and by the action of the receivers.

The Wabash Company, in 1883, 13 months before the receivers were appointed, leased its lines east and west of the Mississippi river to the Iron Mountain & Southern Railway Company. It appears that at this time the latter company was owned and operated by the Missouri Pacific Company. The annual report of that company for 1883, which is in evidence, shows that it was operating the Wabash property as its own. In December, 1883, the Wabash Company ex-

ecuted a mortgage upon its lines to the Iron Mountain Company to indemnify it for advances made under the lease. In this mortgage it is stated that the Iron Mountain Company is in possession of the mortgaged property, and that it shall remain in possession while the lease continues in force. It sufficiently appears from this and other facts that at the date of the lease the Missouri Pacific took charge of the Wabash system, including its accounting department. It was claimed that the Missouri Pacific was not able to operate the Wabash lines at a profit, and on May 19, 1884, under a clause in the lease, notice was given to the Wabash Company that the lessee had sustained a loss, in the operation of the leased lines, of $4,000,000.

The Wabash Company had at this time outstanding paper, representing floating indebtedness, amounting to $3,000,000 or more, some of which would soon mature. This, however, was no part of the indebtedness last referred to. Humphreys, Gould, Dillon, and Sage were liable as indorsers on all this paper. A meeting of the executive committee of the Wabash Company was accordingly called, and held at New York on May 21, only two days after the notice above referred to had been served upon the last-named company by the Iron Mountain Company. Gould, Humphreys, Dillon, Sage, and Hopkins were present at this meeting, and, with the exception, perhaps, of Humphreys, all were stockholders and directors in the Missouri Pacific or the Iron Mountain Company; and all, including Humphreys, were interested as stockholders and directors in the two last-named corporations, or as indorsers on the outstanding notes. At this meeting, on motion of Humphreys, it was resolved that steps be at once taken to secure the appointment of a receiver; and no delay occurred in the preparation of the bill, which was filed a few days thereafter in the court at St. Louis.

On May 30th, the Wabash Company filed its petition, representing that its promissory notes, amounting to about $2,300,000, were outstanding, some of which would soon mature; that these notes were indorsed by "sundry individuals of high credit and financial standing." "For the sake of entire frankness," the name of Solon Humphreys was disclosed as one of the indorsers, but the names of Gould, Dillon, and Sage, the other three indorsers, were withheld, "because of the personal inconvenience and injury which might result to them from the publicity thereby given to their business affairs."

This petition prayed that receiver's certificates be issued to enable the receivers to meet the outstanding notes as they matured; and on the same day an order was entered, directing the receivers to use their obligations, as such, to protect these notes. This order also contained other directions, which need not be here mentioned.

The Central Trust Company and James Cheney, trustees in the general mortgage, appeared before the court in St. Louis, on the twentieth day of June, for the purpose of having this order rescinded or modified; and on that day the court entered the following order:

"This order shall not be construed as establishing any priority of lien in favor of such receivers' obligations, or of the obligations of said railway company now outstanding; but such priority shall be subject to the further direction of the court."

On the day the last-named order was entered, the receivers were authorized, on motion of the Wabash Company, to maintain the executive and transfer offices of the company in New York; and, for that purpose, to continue upon salaries the vice-president and subordinate officers and clerks. This has been done at a heavy expense to the trust. On the sixth of June, on motion of the receivers, a further order was entered, directing that receivers' certificates be issued amounting to $2,000,000, which should be a first lien on the entire property of the Wabash Company, to enable the receivers to pay off specified classes of claims, among which were labor and supply claims accruing within six months before the receivers were appointed. These debts for labor and supplies the receivers knew had been contracted while the Wabash system was operated by the Missouri Pacific under the lease.

On June 30th the receivers asked the court for an order to enable them to pay rebates on traffic before they were appointed, and such an order was entered by the court at St. Louis on July 10th. Under this order $360,000 of rebate claims have been paid on traffic actually handled by the Missouri Pacific during the time the Wabash lines were operated under the lease, and that the receivers asked for the order knowing how the indebtedness had been contracted. The proof shows that the receivers have used $3,200,000 or more of the receipts which came into their hands from the operation of the property in paying labor and supply claims incurred by the Missouri Pacific during its possession under the lease, and that a large additional amount of claims of the same character has been audited for payment.

The decree of foreclosure which was entered at St. Louis on July 6, 1886, provided that nothing in it, or the sale to occur under it, should in any way prejudice or affect the rights of parties secured by any of the underlying mortgages. The decree also contained the following paragraph:

"Nor shall such conveyance, transfer, or assignment withdraw any of said railroad property or interests to be sold under this decree, as hereinbefore directed, from the jurisdiction of this or any of the other courts aforesaid; but the same shall remain in the custody of the receivers until such time as the courts shall, on motion, direct said property in whole, or, from time to time, in part, to be released to said purchaser or purchasers, or any of them; and shall afterwards be subject to be retaken, and, if necessary, resold, if the sum so charged or to be charged against said property, or any part thereof, or said receivers, as aforesaid, shall not be paid within a reasonable time after being required by order of this court or said other court. The conveyance and transfer of said property shall be subject to the power and jurisdiction of the said courts, and the purchasers of any part of said property shall thereby become and remain subject to said jurisdiction so far as necessary, to the en-

forcement of this decree; and such jurisdiction shall continue until all the claims and demands that have been or may be allowed against said property, or any part thereof, or said receivers, by order of said courts, shall be fully paid and discharged."

The master appointed for that purpose sold the property, with certain exceptions, which need not be mentioned, to the purchasing committee on the twenty-eighth of April, 1886, for $625,000. This sale was confirmed by the court on the fifteenth day of June, 1886, and the order of confirmation contained the following:

"And any deficit or loss incurred by the receivers herein, from the operation of any of said railroads, as also of the Eel River Railway, from the first day of June, 1886, shall, as a further condition of the confirmation of the said sale, be charged upon the interest of said purchasers in the property acquired by them at said sale. * * * And it is further ordered, adjudged, and decreed that this decree of confirmation of the sale of the premises and property, rights and franchise, as aforesaid, and the deeds hereinbefore ordered to be made, shall be subject to the terms and conditions of the decree of sale heretofore entered in this cause; whereby it is provided, in addition to the sums required by said decree of sale, and by this order, to be paid into court in cash, that there should be paid such further sums as may be needed, and as this court may direct, in order to meet claims which this court may adjudge in this case to be prior, in equity, to the mortgages foreclosed by said decree, and whereby the court directed that the railroads, property, or interest sold thereunder should remain in the custody of the receivers until such time as the court should, on motion, direct said property, in whole, or, from time to time, in part, to be released to said purchasers, and should afterwards be subject to be retaken, and, if necessary, resold, if the sums so charged, or to be charged, against said property, or any part thereof, or said receivers, as therein provided, should not be paid within a reasonable time after being required. By order of the court."

On motion of the counsel for the purchasing committee, the court, at St. Louis, on the twenty-first of September, 1886, entered the following order:

"Ordered that from any surplus in their hands arising from the operation of the property in their charge, over and above the necessary operating expenses, the receivers herein are authorized, as to them may seem meet, to pay, in whole or in part, such interest coupons or bonds, secured by mortgages superior in right to the mortgages foreclosed herein, as they may be requested to pay by the purchasers at the sale made under the decree herein, their successors or assigns."

And on the same day, on the motion of the same counsel, the following further order was entered:

"Ordered that in case the purchasers at the sale under the decree herein, or their successors or assigns, shall become possessed, by purchase or otherwise, of any claims or demands against the property in charge of the receivers in this cause, they shall be subrogated to the rights of the original holders of said claims or demands."

The address of the purchasing committee, issued on the first of June, 1886, to the holders of bonds secured by' the senior sectional mortgages, appears to have been the first appeal or demand which

was made upon them to scale down their interest, or waive any of their legal rights. That address dwelt on the importance to the bondholders of keeping together the long line of road from Omaha and Kansas City to Toledo, by way of St. Louis and Hannibal, including all its main lines and branches connecting with Chicago, and possibly the branch to Detroit. It was urged that the lines east of the Mississippi river would be greatly benefited by such a course, as the funded debt on the lines running from the Mississippi river to Kansas City was comparatively light, and that the latter lines could be and were operated at a profit, after paying interest; and that, by maintaining the connection, the volume of business done by the lines east of the river would be greatly augmented. The bondholders were told that the total debt, including receiver's certificates, was upward of $4,000,000, to which was to be added the car trust debt of $3,196,-000, all of which was resting upon the property as preferred indebtedness. One of the reasons given in this address why the receivers had been unable to pay interest was that a number of lines in the system had been operated at a loss, and that the earnings had been taken from other lines, including the main lines east of the Mississippi river, to make good this loss. The creditors whose bonds were secured by senior mortgages on the property east of the river were asked to reduce their interest to 5 per cent. per annum, to fund the interest on their bonds for 18 months at the same rate of interest, and to waive their right to foreclose certain mortgages until after three successive years of default. The bondholders were warned in this address that if they did not accept these propositions, and attempted to foreclose their mortgages, the litigation would be long and expensive; that many intricate questions would arise as to the apportionment of the receivers' debts, the ownership of the rolling stock, and terminal facilities; and that the payment of coupons would be deferred indefinitely.

At a conference between a committee of the bondholders, appointed at a meeting on July 8th, and the purchasing committee, the above terms were agreed to, with this modification:

*First.* A reduction of interest to 5 per centum per annum upon the several classes of securities. *Second.* The funding of 18 months' interest—three coupons—on the same into bonds to be designated "coupon bonds," in three series,—coupons of the first mortgages and funded debt 7's to be funded in the first series; coupons of second mortgages and funded debt 6's, into the second series; and coupons of the consolidated bonds and 7's of 1879, in the third series. Interest on the 7 per cent. script to be funded to February 1, 1886, and on the 6 per cent. script to May 1, 1886,—these coupon bonds to bear interest at the rate of 5 per centum per annum, payable semi-annually, from August 1, 1886, for first series; from November 1, 1886, for second series; and from January 1, 1887, for third series; and to take rank in payment, after the mortgages, according to the priority of those from which coupons so funded may be detached, viz.: Coupon bonds of the first series to be entitled to payment of interest next after payment of interest on the first mortgages; coupon bonds of the second series, next after payment of interest on the sec-

ond mortgages; and coupon bonds of the third series, next after payment of interest on the consolidated bonds and 7's of 1879.

Holders of over $4,000,000 of bonds declined the terms offered by the purchasing committee.    They insisted upon their rights as senior creditors, notwithstanding the discouraging prospect held out to them by the purchasing committee.

On September 27th, O. D. Ashley, as secretary of the purchasing committee, informed the bondholders, in a circular address, that it was still claimed that the floating debt of over $4,000,000 would have priority over all the mortgages; and that those who selfishly stood out against the committee's scheme "would enter into the most complicated litigation ever known in the railroading of this country, with its exasperating delays and endless expense," the prospect of which would be pleasing only to lawyers.    Mr. Ashley, it is proper to say, was then and still is an officer of the Wabash Company, and his salary as such, as well as his salary as one of the purchasing committee, has been regularly paid by the receivers out of the earnings of the road.

At a meeting of the bondholders, held at New York on August 12th, it was distinctly stated by persons who were active in advocating the purchasing committee's scheme that the floating indebtedness of more than $4,000,000 had been adjudged by the court to have precedence of all the mortgages, and that no interest would be paid until that indebtedness has been discharged or provided for.    In addressing that meeting, Mr. Joy, president of the Wabash Company, and one of the purchasing committee, said:

"We have got $4,000,000; we can relieve you of that debt.    Now, if we do not relieve you of it, if you get into litigation, we cannot use that $4,000,-000.    Some of these underlying securities have got to pay it; there is no escape from that.    Where will it come from?    The fourth mortgage, I am sure, cannot pay it.    The two last mortgages cannot afford to pay it.    It is as much as they amount to, almost.    They will sink down on you, and you will all feel the weight of it, even to the first security."

The decree of foreclosure, fairly interpreted, required the purchasers to pay all claims against the receivership.    The purchasing committee bid off the property for the stockholders and junior bondholders, including Humphreys, whose interests are in opposition to the views and interests of the bondholders who have refused to accept the funding scheme.    The orders of September 21st were obtained by the purchasing committee, or by persons whom that committee represented.    Those orders so far changed the terms of the sale and the order of confirmation as to allow the earnings in the hands of the receivers, which were covered by the underlying mortgages, to be used in the payment of coupons belonging to bondholders who assented to the funding scheme, while the same right was denied to non-assenting bondholders; and they also permitted the purchasing committee

to keep alive receivers' certificates amounting to $4,000,000 against the non-assenting bondholders.

It was stated at the argument of this motion, by one of the counsel for the purchasing committee, that under these orders the receivers would pay such coupons as might be selected for payment by the purchasing committee, while no interest would be paid to non-assenting bondholders. The boldness of this scheme to aid the purchasers, by denying equal rights to all bondholders secured by the same mortgages, is equaled only by its injustice. The right is asserted by the purchasers of the property, in a court of equity, to take the earnings of a road covered by a mortgage, and pay part of the coupons secured by that mortgage, to the exclusion of coupons secured by the same mortgage, and falling due at the same time. Doubtless the counsel who obtained the orders of September 21st was not as frank in avowing to the court at St. Louis the purpose of the purchasers as he was here, and still is, in defending his interpretation of them. It is not to be presumed that that court entered these orders intending or expecting that they would be used as a means of coercing non-assenting bondholders into the funding scheme. I prefer to infer, and do infer, that that court supposed the purchasing committee was progressing amicably with the bondholders, and was ignorant of the fact that part of them were, and for some time had been, stubbornly resisting the funding scheme.

It is said by one of the counsel for the purchasers, by way of excuse for their failure to comply with the terms of their bid, and for obtaining the orders of September 21st, that the purchasers bought the property without being fully informed as to its value; and that they had subsequently learned that they could not afford to take it incumbered with the various senior underlying mortgages, and pay the debt contracted by the receivers, and the floating debt existing before the receivers were appointed. In answer to this, it is safe to say that no one knew better at and before the sale the value of the Wabash property than the four indorsers and others represented by the purchasing committee.

It was also urged in defense of the orders of September 21st, and the action of the purchasers thereunder, that the provisions of the decree of foreclosure, and the order of confirmation, whereby the court retained authority to retake the property and resell it for failure on the part of the purchasers to comply with the terms of the sale, authorized the purchasers to abandon their bid; and that, not being obliged to complete it, they were at liberty to prescribe terms upon which they would consummate it. Argument is unnecessary to demonstrate that these provisions were inserted, not to secure to the purchaser the right to complete his purchase, or abandon it, as he pleased, but as a reservation of jurisdiction over the property, to be exercised if the purchaser failed to comply with his contract.

The Chicago Division bondholders claim that the Chicago terminals are covered by their mortgage, and that the holders of the collateral trust bonds, including Mr. Humphreys, resist this claim, and insist that they are entitled to a first lien on these terminals; which raises another conflict of interest between the receivers and the non-assenting bondholders.

The mines and property of the Ellsworth Coal Company are adjacent to the Wabash Railway. The original stock of this company was $24,000, which was increased in June, 1885, to $67,500. Humphreys, Gould, Dillon, Sage, Hopkins, and Charles Ridgeley, all directors of the Wabash Company, were stockholders in the coal company. It does not appear from the evidence that any one else held stock in this company. During the year 1885 the receivers purchased of the coal company 166,842 tons of coal, paying therefor $190,769.91; and up to September 1, 1886, they purchased 145,191 tons, paying therefor $163,724.42, which was at the rate of $250,000 for that year. The receivers have paid out of the earnings $15,401.48 as rebate on coal shipped by this company prior to their appointment, and while the Wabash lines were operated by the Missouri Pacific under the lease to the Iron Mountain Company. This they claim to have done under orders of the court at St. Louis. They have also paid rebates of $63,309.85 on coal shipped since their appointment, and up to September 1, 1886. The total rebates paid by the receivers to the coal company amounted to $80,711.33, which is more than the entire capital stock of the coal company. While it is true witnesses have testified that the receivers paid no more than the market rate for coal purchased by them for fuel, and that they charged the coal company a reasonable rate upon the coal which they carried for it, there is also evidence tending to show that the price paid for the coal purchased for use was too high, and that the freight upon the coal shipped was too low. The relation which these two corporations sustained to each other of itself exposed the owners of the stock and the directors of the coal company to the suspicion of intending to benefit that company at the expense of the Wabash Company. It is not strange if, as officers of the Wabash Company, dealing with themselves as officers of the coal company, whose entire stock, or the greater portion of it, we may assume, these men owned, care was taken that the Wabash Company should pay a liberal price for fuel obtained from the coal company, and that the latter company should pay a low rate upon its shipments of coal. Men with a proper appreciation of their rights and the rights of others—trustworthy men—are not apt to be found in such inconsistent relations. Gould, Humphreys, Dillon, Sage, Hopkins, and Ridgeley are men of stern integrity, if their interests in the coal company did not improperly influence their action as directors of the Wabash Company. It is going very far—further than this court is willing to go—to enforce a secret contract for the rebate of freight paid to a railroad company, and to the

extent of his interest in the coal company Humphreys allowed a rebate to himself.

It is proper to say that Mr. Tutt testified that when he heard of serious charges in connection with the Ellsworth Coal Company matter he instituted an investigation, but it does not appear that he developed anything worthy of being brought to the attention of the court. His own evidence shows that he was ignorant of the location of the mine; that he thought the rate for St. Louis was one dollar a ton, when, in fact, it was much less. He had never seen any of the numerous rebate vouchers in favor of the coal company, and did not know that any such existed. According to the auditor's testimony, the regular tariff was two dollars a ton on coal to Chicago, and a special rate was given to the coal company of $1.30 per ton, after which 30 cents per ton was paid back to the coal company as a rebate. After the Wabash Company had built a road into the coal fields near Chicago, it was abandoned, and the track taken up, and thereafter the only coal shipped over the Chicago Division was, and still is, by the Ellsworth Coal Company, from its mines, the most of which are 240 miles distant. The evidence strongly tends to show that part of the abandoned track was not removed until after the receivers were appointed.

The receivers say that the debt which accumulated against the Wabash Company before they were appointed, and the large debt which has accumulated against them since their appointment, was caused mainly by the low and non-remunerative rates which were received for carrying freight. In the pamphlet which was issued on June 1, 1886, by the purchasing committee, it was claimed that the average rate of nine and a half mills per ton per mile brought about the present financial condition of the property; and yet it appears that the receivers had been carrying coal to Chicago from the mines of this company, owned in part by one of them, at a much lower rate.

It is insisted for the purchasing committee and the receivers that when the Wabash bill was filed at St. Louis, and the court there appointed receivers, it acquired primary and paramount jurisdiction over the Wabash property and system throughout its length and breadth; and that all persons, including the creditors whose bonds are secured by senior sectional mortgages on property, no part of which is in the state of Missouri, must go to that court to enforce their rights and liens, and that no other court can remove the receivers. If, by the mere force of its own orders, the court at St. Louis acquired the legal custody of the *res*,—the entire Wabash property,—it would be alike the duty and the pleasure of this court to aid that court in the exercise of its primary jurisdiction; but this court feels obliged to take a different view of its duty and the law.

Cases may be found in which the English courts have appointed receivers over property or assets in other jurisdictions and foreign countries, but this has been done only when the parties interested in

the property were personally before the court, and subject to its orders. High, Rec. § 44, and authorities cited. The rule in this country is that receivers appointed by one jurisdiction are not entitled, as of right, to recognition in other jurisdictions, and that courts of equity cannot acquire extraterritorial jurisdiction over property by appointing receivers. *Booth* v. *Clark*, 17 How. 322.

*Muller* v. *Dows*, 94 U. S. 444, which is relied upon in support of the position taken by the counsel for the purchasers and the receivers, was a suit brought in the circuit court of the United States at Des Moines against the corporation to foreclose a mortgage on a line of road running from a point in the state of Iowa to a point in the state of Missouri. The mortgage was foreclosed, and the entire line, including the portion in Missouri, was sold, no ancillary or other proceedings having been taken in Missouri. The decree required the trustees in the mortgage and the railway corporation to execute conveyances to the purchaser, which was done, and the title thus made perfect. The supreme court of the United States sustained the decree and sale. If the supreme court intended to sustain the sale and title regardless of these conveyances, it is to be observed the mortgage in that case covered a continuous, unbroken line of railroad, extending from one state into the other. There is a wide difference between the facts in that case and the facts in the *Wabash Case*, which was a suit by the corporation for the mere appointment of receivers, and not to foreclose a mortgage or other lien.

It may be said in this connection that Gould, Humphreys, Dillon, and Sage, the four indorsers, constituted a majority of the meeting of the executive committee of the Wabash Companies at New York; and that they, and perhaps others who controlled the Missouri Pacific, caused the Wabash bill to be filed, intending, it would seem, if possible, in that suit, to have the large indebtedness for which the four indorsers and the Missouri Pacific were liable made a charge upon the Wabash proper prior to the mortgages, or to have it provided for in some other way, to the injury of the holders of senior securities. Want of effort on the part of the four indorsers, the Missouri Pacific, and the receivers cannot be said to have caused whatever failure has occurred in accomplishing this scheme. The evidence shows that the receivers have paid, out of the income belonging to the bondholders, over $3,200,000 on labor and supply debts incurred by the Missouri Pacific while it was operating the road under the lease, and that they have audited for payment over $500,000 more of such claims.

It has frequently been deemed necessary, in suits against insolvent railway corporations to foreclose mortgages, to appoint receivers to operate and protect the property, pending the litigation; but it is unusual and novel, to say the least, to entertain a bill filed *by* such a corporation against its creditors, and at once, without notice, place the property in the hands of one or more of the directors whose man-

agement has been unsuccessful. Receivers should be impartial between the parties in interest; and stockholders and directors of insolvent corporations should not be appointed, unless the case is exceptional and urgent, and then only on the consent of parties whose interests are to be intrusted to their charge.

While this court claims no authority to review the action of the court at St. Louis, and regrets that it is forced to meet the questions presented by the record, it cannot concede to that court paramount jurisdiction over the property in Illinois. Interest on the bonds secured by the mortgages of 1867 and 1879 has long been in default, and the right to foreclose these mortgages cannot be denied. No part of the property covered by them is within the jurisdiction of the court at St. Louis, and yet the creditors who have filed their bills in this court to foreclose mortgages are told this court has no jurisdiction, and that they must apply to the Missouri court, as a court whose jurisdiction is paramount.

It is earnestly contended that the court should not remove Messrs. Humphreys and Tutt, and appoint some one else to take charge of the property in this jurisdiction, at the instance of creditors representing a minority of the bonds, when a large majority are opposed to such action. As already stated, none of the lines covered by these mortgages run into Missouri, and a suit to foreclose a mortgage is a local action. The majority should not be permitted to force the funding scheme upon the minority. Courts of equity should not refuse to protect the rights of minorities, upon a proper showing, and such a showing has been made in these cases.

The non-assenting bondholders, on the facts already stated, are clearly entitled to a foreclosure of the mortgages of 1867 and 1879, and the Chicago Division mortgage, and to have the property in this state taken out of the custody of the present receivers, and intrusted to some one who is capable and trustworthy. Other reasons might be given for removing the receivers without going outside of the record.

The suit to foreclose the Chicago Division mortgage will proceed here, and leave is given to withdraw the bill to foreclose the mortgages of 1867 and 1879, and file it in the Southern district, at Springfield; none of the property covered by these mortgages being within this district.