## CHATTANOOGA TERMINAL RY. CO. v. FELTON.

### (Circuit Court, E. D. Tennessee, S. D. August 20, 1895.)

1. **EQUITY JURISDICTION—INTERVENTIONS.**
   A federal court of equity, in an ancillary case, has jurisdiction to control a railroad receiver against whom complaint is made by an intervening petition filed against the receiver in the ancillary receivership litigation.

2. **RAILROAD COMPANIES—RECEIVERS.**
   A railroad receiver is an officer of the court, and his officers and employés are agents and employés of the court.

3. **SAME—AUTHORITY—INJUNCTION.**
   Such a receiver secretly, in the nighttime, and on Sunday, and without permission of the court or authority of law, sent his chief officials with a construction train loaded with track material and a large force of workmen, and entered, forcibly and against the protest of the owner, upon the tracks and right of way of another railroad, and laid cross-overs and switches to connect a leased line of the receiver with certain private manufacturing establishments already served and supplied with transportation accommodations by such other railroad. *Held*: The facts justified, on mere preliminary motion to show cause, the issuance of an injunction, both prohibitory and mandatory, to restrain entrance upon and use of the tracks and right of way, and to require a removal of the cross-overs and switches already laid, so as to place the property in the condition in which the receiver found it before his unlawful interference.

4. **EMINENT DOMAIN—WHEN RIGHT EXISTS.**
   In such a case, the right of eminent domain does not exist. The attempted taking of the property was for a purpose the same as that for which the property was already used; and switch connections with private manufacturing enterprises, for the purpose of handling their freight, do not constitute such a public use as will justify the condemnation of private property.

5. **SAME—PREREQUISITES—COMPENSATION.**
   A forcible seizure, against the will of the owner, of private property, even for a public purpose, is unauthorized by law, prior to the payment of compensation for the taking.

6. **SAME—POWERS OF LESSEES OF RAILROADS.**
   Whether the lessee of a railroad can exercise the right of eminent domain to build switches and spur tracks to the leased line, when such do not connect to its own line, or whether such right remains in, and must be exercised by, the lessor company,—reserved, without expression of opinion.

7. **EQUITY—ANCILLARY JURISDICTION—REMOVAL OF RECEIVERS.**
   While a court of ancillary jurisdiction has the same authority over a receiver as the court of the primary appointment, yet, in deference to that comity which exists between the federal courts, jurisdiction in the ancillary court ought to extend only to matters respecting property and rights of property within the court's territorial limits; and the question of the receiver's removal for misconduct ought to be presented to the court which first appointed him.

8. **INJUNCTION—RAILROAD COMPANIES—RECEIVERS.**
   A preliminary injunction may be made to operate upon the receiver, his officers, servants, and agents, and all persons claiming in privity with him, by conveyance, lease, or other contract.

9. **SAME—LIABILITY FOR WRONGFUL ACTS—DEFENSES.**
   A receiver of a railroad cannot escape responsibility by a claim that the acts complained of were done, not as receiver, but for another distinct railway. The power, position, and property, with all its appliances, were in his possession as the trusted officer and agent of the court, for the purpose only of carrying into effect the orders of the court in the administration of the trust; and the fact that, instead of using that property and power, and the men under his control, including his chief officers, for the purpose of

v.69F.no.4—18

doing an unlawful and violent act, himself, he surrenders these into the custody and under the direction of another, with the distinct knowledge that they were to be used for an unlawful purpose, will not affect the responsibility.

10. SAME—LIABILITY FOR ACTS OF SERVANTS.

Neither can a receiver, while using the power, property, and men under his control, in a trust capacity, deny responsibility for what his officials and servants do; nor can he deny that he was acting in the premises as a receiver.

This is a petition by the Chattanooga Terminal Railway Company against S. M. Felton, receiver of the Cincinnati, New Orleans & Texas Pacific Railway Company, for a prohibitory injunction against the use and occupancy of certain switches, and for a mandatory injunction requiring the removal of such switches. Decree for complainant.

Brown & Spurlock, Young & Coleman, and Thomas, Elder & Thomas, for petitioner.

Shepherd & Frierson, for defendant.

CLARK, District Judge. The questions now to be disposed of arise upon the petition filed by the Chattanooga Terminal Railway Company, a corporation organized under the laws of Tennessee, and hereinafter, for convenience, called the "Terminal Company," in the above-named case. The Cincinnati, New Orleans & Texas Pacific Railway Company is a corporation organized under the laws of the state of Ohio, and hereinafter called the "Cincinnati Southern Road." This company was organized for that purpose, and is operating the lines of railroad originally constructed and now owned by the trustees of the Cincinnati Southern Railway, under a lease from that company, and among parts of that railway material to be noticed is what is called its "River Track," extending along the west side of the city of Chattanooga, and up the general course of the Tennessee river, northwardly along that section mostly occupied by manufacturing and other business establishments. It will be called herein the "River Track." Another company connected with the facts of this transaction, and necessary to be referred to, is what is called the "Chattanooga Belt Railway," a company which it is claimed was recently formed for the purpose of taking the property formerly owned by the Union Railroad and the Chattanooga Union Railway Company, recently sold under decree of this court. This company was organized under the laws of Tennessee, and will be called the "Belt Road." The Terminal company owns and operates a line of railway running practically parallel with the river track aforesaid, from Boyce street to and beyond Ash street northwardly. On the night of August 3, 1895, a construction train came into the city of Chattanooga from and over said Cincinnati Southern road with about 20 flat cars, loaded with material suitable for the work hereinafter mentioned, and with a crew of about 100 men, and entered upon the right of way of the Terminal company just after midnight, and began the work of putting in certain cross-over or switch tracks from said river track of the Cincinnati Southern road, and tearing up, for that purpose, the tracks

of the Terminal company. Three of these switch-over tracks were for the purpose of reaching the Plow Works, the Ross-Meeham Brake-Shoe Foundry, and the Malleable Iron Works, manufacturing establishments situated on the line of the Terminal company, and the business of which was already being handled by the Terminal company. The cross-over or switch tracks do not run at right angles to the Terminal company's line, but in such diagonal direction as that they appropriate almost longitudinally the right of way of the Terminal company, so far as may be necessary to reach said factories; and, in fact, in the method of construction, as appears on the map made, they actually appropriate and use the track of the Terminal company for some distance. These switches are put in for the sole purpose of reaching the industrial establishments aforesaid, and do not reach any new or different place from those already served by the Terminal company, and do not penetrate any new territory. The only purpose is to reach and handle the business of these three establishments already transacted by the Terminal company. Then, at the crossing of Ash street, a line was put in upon the right of way of the Terminal company longitudinally, for the purpose, as the defendants insist, of connecting the river track with what they claim is an old track of the Chattanooga Union Railway Company, running northwardly from that point. It may be stated, in this connection, as well as elsewhere, that the defendants do not claim that either the Cincinnati Southern road or the Belt road had any right or title to the property on which these cross-over tracks are placed, but assert a right of way to so much of the ground as is occupied by the track put in at Ash street. This claim, I think, is so entirely without foundation, from anything disclosed in the record, that it can be easily stated that neither the Belt road nor Cincinnati Southern road had title to the land occupied by any of these tracks put in during the night and Sunday following, as before stated. The position now taken by the defendants is, that, although they had no title to the property, having entered upon the same, and taken and appropriated the same for public use, and being in the possession thereof (although by violence and unlawfully), still, inasmuch as they have the right, by regular condemnation proceedings, in accordance with law, to take this property for public use, this court should not disturb their possession, or the use of the property, but should leave the Terminal company to its remedy at law in an action for damages for the property so taken; or that this court should, in some method, simply require compensation to be made, and this is the limit of relief which it can grant. The Belt road, as before stated, was recently formed for the purpose, as said in argument, of taking the property of the Chattanooga Union Railway Company. It has obtained no title thus far to that property; and the defendant's able counsel frankly concedes that it has no property now at all subject to execution at law, but maintains that, under a plan of reorganization agreed upon, it will soon become the owner of the property sold, as before stated. It is not controverted that a party holding a judgment and execution against that company would have to resort to further litigation for the satisfaction of the same. The Cincin-

nati Southern road is insolvent, and now in the hands of a receiver, appointed in the above cause, under an ancillary bill filed in this court, the original bill for that purpose having been filed in the United States court at Cincinnati, and Felton appointed receiver by Judge Taft in that court, and also under the ancillary bill in this.

The construction train and crew of men before mentioned came to the place of operations under the control of R. Carroll, the general manager of the road, under Mr. Felton's control, as receiver, and A. Griggs, division superintendent of that part of the line extending from Somerset, Ky., to Chattanooga; and with them was Mr. Nicholson, the engineer of the same road under Mr. Felton. After this train had entered the city, it was assisted, to a limited extent, by the officials of the Belt road, although it sufficiently appears that the officials of that road were not advised of the plan of operations until August 3d, and after the plans had been determined upon between Felton and his general manager, Carroll. Certain telegraphic correspondence took place between Felton and his manager, Carroll, too lengthy to be embraced in this opinion in full, but parts of the same are set out as follows:

"Chattanooga, Aug. 2, 1895.

"To S. M. Felton, Care Monmouth Club, Monmouth Beach, N. J.: Getting material together and will begin work midnight, Saturday; expect to finish by midnight, Sunday. Suggest you wire strong message Capt. Chamberlain to-night to co-operate, as Judge Shepherd says work must be done under charter Belt Company. Three crossings needed.          R. Carroll."

"Monmouth Beach, N. J., Aug. 3.

"R. Carroll, G. M. C., N. O. & T. P. Ry. Co.: Keep everything quiet. Act, in all legal matters, under Shepherd's advice. Avoid personal conflicts, and see that connections are made so we can handle business. Have wired Chamberlain. Keep me posted.          S. M. Felton."

"Chattanooga, Aug. 3, 1895.

"To S. M. Felton, Receiver, Monmouth Beach, N. J.: Satisfactory interview with Chamberlain this morning. Acting strictly on Shepherd's advice. Do not anticipate conflict, but work must be done, and hope to report completion by wire Sunday.          R. Carroll."

"Monmouth Beach, N. J., Aug. 3, 1895.

"R. C. Carroll, G. M. C., N. O. & T. P. Railway Company: I have just received your tracing. Shaler advised me, after careful examination, that we could reach all industries on terminal tracks. I don't expect you to put in tracks that cannot be used, or waste money; but, with co-operation of industries, you ought to be able to get in enough tracks to make our position safe. See Capt. Chamberlain. Ask him to try to get lease of Southern Iron tracks at reasonable figures.          S. M. Felton."

"West End, Long Branch, N. J., Aug. 3, 1895.

"R. Carroll, G. M. C., N. O. & T. P. Railway Company: Am very much pleased with the work you have done. Don't lose your advantage. Have Judge Shepherd to get injunction first thing in morning, or take legal steps preventing interference from any one with our work. Of course, Nashville people have no right yet to property, and cannot interfere legally. Let me know the situation in the morning.          S. M. Felton."

"Monmouth Beach, N. J., Aug. 5, 1895.

"R. Carroll, Central Passenger Station: Does Judge Shepherd say switch connections can be used? I should say crossings were absolutely necessary. Fear part of your work is wasted, unless court gives us right to use their track at switches.          S. M. Felton."

"Monmouth Beach, N. J., Aug. 3, 1895.

"H. S. Chamberlain, Chattanooga, Tenn.: I am advised by J. W. Thomas that he has leased terminal; so it is necessary to take vigorous measures. Please aid Carroll and Shepherd in every way possible. I find it necessary to use Belt charter; so must have your assistance. Kindly help me in this. Spencer is anxious it should be done, and I should not have brought you in it but for reasons given. Will consider what you do a personal favor. Please answer here.                                        S. M. Felton."

"Monmouth Beach, N. J., Aug. 5, 1895.

"Capt. H. S. Chamberlain, Chattanooga, Tenn.: We better hold the fort now, and make no compromise. Have you heard from Thomas? How does Nicholl feel? Very much obliged to you. What about my trackage claims?
                                        "S. M. Felton."

In addition to these telegrams, numerous affidavits are put in evidence, and it is apparent that the entire facts of the transaction have been brought out as fully as if the case had been prepared for final hearing. It may be stated here that, so far as appears from the record, neither Carroll, Felton, Griggs, nor the engineer, Nicholson, has any interest in, or occupies any relation of obligation to, the Belt road. The petition in the case is brought against Felton, as receiver, and Carroll and Griggs, and charges that the invasion of plaintiff's property, and its unlawful appropriation in the manner set out, was done by Felton, as receiver of the Cincinnati, New Orleans & Texas Pacific Railway; and complains that, as he is the officer and trusted agent of this court, acting under its immediate orders, it is virtually the court itself taking the property of the petitioner, by violence, and without authority of law. The defendants deny, in general terms, that the work was done, by or for Felton, as receiver, but say that it was done for and under the direction of the new company, called the "Belt Road." It was probably meant by this statement in the answer to make it conform to and support the claim that the work was done under the charter of the Belt road, rather than to deny that the receiver was personally cognizant of and concerned in the operations which took place. Upon the foregoing facts, I think it is clear, beyond all question, that the petitioner is entitled to a prohibitory injunction restraining the use and occupaton of the tracks and switches thus put upon its property without compensation, and without any lawful method of taking. And, as this injunction will operate, and will be made to operate, against the defendants who actually committed the unlawful act, as well as against the officials of the Belt road, and all other persons aiding and abetting or holding by privity of contract with these defendants, it would, if this case involved no feature beyond that of ordinary litigation of the kind, become unnecessary for this court to decide, at the present time, whether the work was done by Felton as receiver, or for his own purposes, or for the benefit of the Belt road. So far as this character of injunction is concerned, the petitioner has brought its case clearly within the doctrine announced by the supreme court of the state in the case of Parker v. Railroad Co., 13 Lea, 669, in which an injunction was asked and granted inhibiting the defendant railroad company "from occupying, holding, and controlling a right of way for a branch road being constructed over com-

plainant's land by said company, until compensation is made both for the land occupied, as well as incidental damages have been paid or secured, and until appropriate steps are taken to condemn and appropriate said land in a lawful manner"; and, giving the opinion, Judge Freeman said:

"Our bill of rights is very imperative (section 21) 'that no man's particular services shall be demanded, or property taken or applied to public use, without the consent of his representatives, or without just compensation being made therefor; and this compensation must be secured beyond all contingency.' White v. Railroad Co., 7 Heisk. 538, 541. That is, it must be secured or paid, or else it cannot be said that 'just compensation' has been made therefor. In fact, a strict construction of the language would require actual payment in cash before the taking. It is certain, however, this language cannot be complied with, either in letter or spirit, where the land is entered upon and taken, and not only no compensation paid or secured, but the party required to engage in a fruitless litigation with an insolvent company, the result of which would be a judgment only, but no compensation whatever. This would be to take the citizen's land, and impose the burden and expense of a lawsuit only by way of compensation, and make the constitutional provision an illusion."

I refer to the decision of the supreme court of the state, because a question of eminent domain, such as this, involves the construction of the state constitution and statutes, as to which the ruling of the court of the highest authority in the state is followed by the federal courts. In the courts of the United States, when acting in accordance with their own ruling, it is only necessary in such cases, to authorize an injunction for the plaintiff, to show that his property has been taken, or is being taken, in violation of the constitution requiring compensation to be first made. In Pumpelly v. Green Bay Co., 13 Wall. 166, the supreme court of the United States said in substance, that, by the general law of European nations and the common law of England, it was a qualification of the right of eminent domain that compensation should be made for private property taken or sacrificed for public use; and the constitutional provisions of the several states which declare that private property shall not be taken for public use without just compensation were intended to establish this principle beyond legislative control; and, in the late case of Osborne v. Railroad Co., 147 U. S. 258, 13 Sup. Ct. 299, in respect to a question of eminent domain, Mr. Chief Justice Fuller, delivering the opinion of the court, said:

"As a general rule, this court follows the decisions of the highest tribunal of a state upon the construction of its constitution and laws, if they do not conflict with, or impair the efficacy of, some provision of the federal constitution or of a federal statute; but we are not required to express an opinion as to the applicability of that rule in this case, as the decree must be affirmed on other grounds. Whenever the power of eminent domain is about to be exercised, without compliance with the conditions upon which the authority for its exercise depends, courts of equity are not curious in analyzing the grounds upon which they rest their interposition. Equitable jurisdiction may be invoked in view of the inadequacy of the legal remedy, where the injury is destructive or of a continuous character, or irreparable in its nature; and the appropriation of private property to public use, under color of law, but in fact without authority, is such an invasion of private rights as may be assumed to be essentially irremediable, if, indeed, relief may not be awarded ex debito justitiæ."

It would seem, therefore, that the courts of the state have construed and enforced the terms of the constitution less strictly than the courts of the United States; but, as stated, the plaintiff has brought itself fully within the doctrine announced by the courts of the state; for it clearly appears, and is not controverted, that the Belt road has no property whatever subject to execution, and the plaintiff, for property taken, is not required to resort to what may grow out of any complicated plan of reorganization, and to probably interminable litigation, to obtain that just compensation which the constitution plainly requires shall be made before the property is taken and appropriated; and if there is one right of the citizen which the courts are under a higher obligation to fully protect than another, it is a right which has been guarded by express and specific declaration in the constitution.    And for a court to withhold such process as will furnish full relief is a denial of justice, and would justly deprive the court of the respect and confidence of the community, and encourage a resort to violence.

So far as the right to look to Mr. Felton, receiver, for compensation, is concerned, it is sufficient to say that the company which he represents is insolvent and now in his hands as receiver, and that the unlawful invasion of the plaintiff's property, if done by the receiver, was without authority of law, and without authority, express or implied, from the court, and could not by the court lawfully be made a charge against the funds to the credit of the receivership, if any. So that both parties charged with this unlawful taking of property are, for all practical purposes, insolvent, and the plaintiff is clearly without any adequate remedy except that of injunction.    In addition to this, I am clearly of the opinion that neither the Belt road, under its charter, nor Felton, under the charter of the Cincinnati Southern road, had any lawful right to have condemned and appropriated this property, if he or the company had attempted to do so in the method provided by law.    It is not claimed that Felton, as receiver, had any such right, and it is set up in avoidance in the answer that the taking was under authority of the Belt road charter.    The crossover switches and the connections which form the subject of the controversy, are in no just or reasonable sense crossings at all.    No new territory is penetrated or served by the road, and the only purpose of these switches was to reach certain manufacturing establishments whose business was already being handled by the Terminal company; and was done for the distinct purpose, as far as possible, of taking that business away from the Terminal company. It was much more nearly a longitudinal appropriation of its right of way for a spur track to these factories, and, indeed, an actual use is necessary to be made of a considerable part of the Terminal company's track in order to make these spur tracks available to the defendants. The crossing at Ash street is clearly a track parallel to that of the Terminal company, and on its right of way, and, besides, the use of spur tracks for the purpose of reaching these manufacturing establishments is of no concern to the public, and it is not a taking for public use.    Kyle v. Railroad Co. 4 L. R. A. 275, and notes; In re Split Rock Cable Road Co., 128 N. Y. 408, 28 N. E. 506, and cases

cited. And it has been repeatedly decided by the supreme court of this state that the power to take property under the right of eminent domain depends upon and is limited by public necessity. Railway Co. v. Telford's Ex'rs, 89 Tenn. 293, 14 S. W. 776; Memphis Freight Co. v. Mayor, etc., of Memphis, 4 Cold. 428; Harding v. Goodlett, 3 Yerg. 40; Clack v. White, 2 Swan, 548; Weidenfeld v. Railroad Co., 48 Fed. 615.

It is a well-established proposition, too, that when property has already been condemned, and is devoted to a public use, it may not be taken for exactly the same and no different or higher use than that for which it is already appropriated. This is the rule established by well-considered cases, in the absence of specific legislation whose terms are such as to require a different interpretation; and the legislation in this state is not of that character. When a franchise is granted with power to take or acquire property for public use, it is a fair and just implication that, where large sums are invested in the enterprise, it shall not be destroyed by another company armed with power to condemn for exactly the same use and to take away the same business already done by the older company. This is inherently unjust, and is bad policy, as tending to prevent solid and solvent enterprises in the state. Mobile & G. R. Co. v. Alabama Midland Ry. Co., 87 Ala. 501, 520, 6 South. 404; City of Ft. Wayne v. Lake Shore & M. S. Ry. Co., 132 Ind. 558, 32 N. E. 215; Id., 32 Am. St. Rep. 277; Illinois Cent. Ry. Co. v. Chicago, B. & N. R. Co., 13 N. E. 140, 122 Ill. 473; Postal Tel. Cable Co. v. Norfolk & W. R. Co., 88 Va. 920, 14 S. E. 803; Groff v. Turnpike Co., 144 Pa. St. 150, 22 Atl. 834; Davis v. Railway Co., 87 Ga. 605, 13 S. E. 567; Appeal of Pittsburgh Junction R. Co. (Pa. Sup.) 6 Atl. 564, 9 Am. St. Rep. 128; Appeal of Sharon Ry. Co. (Pa. Sup.) 17 Atl. 234, 9 Am. St. Rep. 133; Fidelity T. & S. V. Co. v. Mobile St. Ry. Co., 53 Fed. 687; Lake Erie & W. R. Co. v. Board of Com'rs Seneca County, 57 Fed. 945; Minneapolis & St. L. Ry. Co. v. Minneapolis W. Ry. Co. (Minn.) 63 N. W. 1035; St. Louis, H. & K. C. Ry. Co. v. Hannibal U. D. Co. (Mo.) 28 S. W. 483; Lewis, Em. Dom. § 276; Rand. Em. Dom. §§ 97, 98. Cases may be found apparently holding otherwise, but, where the result does not depend on special legislation, such cases are not sound in principle, and should not be followed. The question here is that of the right of one corporation to take the property of another for the same or similar public use. The right of the state to grant franchises to a rival company under which competition is established, operating injuriously to an older company, involves a different and distinct question, about which there is not now any doubt, where the older franchise is not by the grant made exclusive. Entertaining these views it becomes unnecessary for me to decide, at this time, whether the charter of the Belt road is valid, or whether that question can be made in the way that it is made, or whether there has ever been any valid corporate organization under such charter, or whether the Belt road, as lessee of the River Track of the Cincinnati Southern road, could on that account exercise the right of eminent domain. All of these are evidently questions of serious import. The plaintiff, however, maintains that its property has been unlawfully invaded and taken

by the trusted officer and receiver of this court, and that whatever he does as receiver is virtually the act of the court, and that the court was thereby put in the false position of having itself authorized and sanctioned the lawless act on the part of its officer. It is further insisted that the receiver should be summarily removed, and should now be required by mandatory injunction to take up and remove the tracks and switches put in at night and during the Sunday following, and thereby make full restoration of the plaintiff's rights and property to its condition as found at the time of the receiver's trespass thereon. And this contention does make it necessary for the court to decide whether the entry upon this property and its attempted appropriation was by and for the Belt road or by the receiver, for the benefit of his own road and for his own purposes. And upon this point the court has no doubt whatever. The facts given in the opening paragraph of this opinion, and appearing in the telegraphic correspondence put in evidence, establish clearly the proposition, if facts can be relied on to establish anything, that this work was done under the direction, at the instance, and for the benefit of Mr. Felton, as receiver. If the force of such facts as appear in this case could be overturned by mere unsupported assertion or by mere naked declaration, all the claim which the law of evidence can make as a safe method of working out the final facts of a case is a failure. The law concerns itself earnestly with the development of facts from which the court may form legal conclusions. The common law did not permit an interested party to testify to any fact in the case, and it never has allowed any party, interested or disinterested, to state conclusions or make mere assertions, but only to give the facts on which it is supposed these rest. It is not necessary for any purpose of this opinion to review the facts in further detail. The very message which opens the telegraphic correspondence, when studied, clearly and distinctly implies that the plan of operation had previously been agreed upon between Mr. Carroll and Mr. Felton, and that Carroll was then carrying forward preparations for the execution of such plan, as by the message he informs Mr. Felton. It clearly appears from the same correspondence, as well as otherwise, that the suggestion that this work be done under cover of the Belt charter was an afterthought suggested by the able counsel of Mr. Felton. And, in addition to the direct and specific evidence of the facts, the inherent improbability of the statement that this work was for the Belt road leads to the same result. Is it credible or possible to believe that defendant Felton would have sent his superintendent, general manager, engineer, and a loaded construction train, and a crew of 100 or more men, so long a distance, and to begin at midnight, and complete through the daytime of the Sabbath so extraordinary and unusual a performance as this, as a matter of disinterested friendship for a company in which neither himself nor any one of the chief actors associated with him had any interest whatever, direct or indirect, so far as appears? Our common reason and common experience forbid that we should believe this to be true. And is it reasonable to suppose that Mr. Felton's general manager, superintendent, and engineer would have entered

upon so remarkable a task as this by the mere direction of the Belt Company; and for the interest of that company, and without the order or direction of their superior, Mr. Felton? It can be certainly said, I think, that no court would go so far as to give credence to this. It is clear, too, from this evidence, that if the so-called Belt Company had anything whatever to do with this, it was as a mere dummy and instrument of the receiver, and not otherwise. It appears that the officials of this company had really little or no notice or knowledge of the plan of operations about to be set on foot until after it had been agreed upon and was in process of execution, and the one telegram, of itself, above quoted, from Mr. Felton to Mr. Chamberlain, is sufficient to show this. In this he stated that he would not have brought Mr. Chamberlain into the affair except for reasons given, expressing his appreciation of the personal favor, and saying that Mr. Spencer is also anxious that this work should be done. It is to be noted that Chamberlain is president of the Belt road. It appears in other parts of the messages that it was thought necessary to administer strength to Mr. Chamberlain in order that he might stand up to the end, as the somewhat perilous looking work went on. It was very much feared, it seems, that the aspect of things was such that Chamberlain would finally weaken. Whether this was on account of the violent character of the work going on, or because it was being done on the Sabbath, and in violation of a statute of the state prohibiting work of that kind on Sunday, does not appear. It is probable that both, with his want of real interest in the matter, were operating to an extent to intimidate Mr. Chamberlain. Nor do I think that, for any practical purpose, the case would be changed, so far as Mr. Felton's relation to it is concerned, if the statement that it was done for the Belt road could be considered credible. The power, position, and property, with all its appliances, were in Mr. Felton's possession as the trusted officer and agent of this court, for the purpose only of carrying into effect the orders of this court in the administration of his trust; and the fact that, instead of using that property and power, and the men under his control, including his chief officers, for the purpose of doing an unlawful and violent act himself, he surrendered these into the custody and under the direction of another, with the distinct knowledge that they were to be used for an unlawful purpose, does not by any means help the case. Nor can Mr. Felton, while using the power, property, and men under his control in a trust capacity, deny responsibility for what they do, nor deny that he is acting as receiver. This would put it in his power to claim that he was acting as receiver when it suited his purposes, and that he was not acting as receiver when he desired to avoid responsibility, although the end accomplished would be done in the same way and by the use of the same property and power. This the law does not permit him, for obvious reasons, to do. It would be as competent for him to say that for a specific time and purpose he had delivered over to others the management and responsibility for the whole railway system. The difference is one of degree and not of kind.

Having reached the conclusion, then, that this was the act of Mr.

Felton, as the officer of this court, the question of what relief should be granted on this application is now to be determined. That this court, in a proper case, and for proper purposes, may make its injunction mandatory, is a doctrine that is no longer open to question. This subject received full consideration in a recent case before Judge Taft, of the circuit court, and Judge Ricks, and the cases are reviewed at length in an opinion by Judge Taft in Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 54 Fed. 730. Reference to that case is all that is necessary for the purpose of the present discussion.

In regard to the question made as to the removal of the receiver, I need only say that the receiver was appointed by Judge Taft in the principal case at Cincinnati, and his appointment here in the ancillary jurisdiction was under the well-known rule of comity in such cases. I therefore think it would be improper for me to consider any question of this kind, and must decline to do so. If it is desired to present any question of this kind, it must be presented to Judge Taft. I think I have complete jurisdiction, and it is a duty devolving upon me, to pass upon any question respecting property and property rights; and this I will do. It is true that so distinguished a judge as Gresham, in Atkins v. Railway Co., 29 Fed. 161, not only passed upon the rights involved in the controversy, but removed the receiver, for what he considered misconduct in his office, and that this was done in a court of ancillary jurisdiction; but Mr. Justice Brewer, then circuit judge, in Central Trust Co. v. Wabash, St. L. & P. R. Co., Id. 621, presiding in the court of primary jurisdiction and administration, complained of this as being in disregard of that comity which had existed between the federal courts, although he fully conceded Judge Gresham's power to do so, and that the removal was lawful and valid; and Judge Brewer acted upon the situation as this removal had left it. I could not, in this or any other case, permit Judge Taft to entertain a similar view in regard to anything I might do. Judge Taft is himself uniformly thoughtful in every detail of that comity and courtesy due to other courts and other judges. So I leave entirely out of view and unaffected by this opinion any question as to whether Mr. Felton should or should not remain the officer of this court. So long as he promptly obeys the orders of this court, I shall take no action in that regard; but, whether citizens within the jurisdiction of this court, and in regard to rights and property situated within its territorial limits, have rights of action against the receiver, and, if so, what order should be made upon him in that respect, are questions upon which it is my duty to pass, and citizens within the district are not required to go to the courts of another state for the redress of such rights. As before stated, the court has the power, and in a proper case it is a duty, to issue a mandatory injunction. This has been the ruling in cases of ordinary litigation, where the parties were all private litigants and strangers to the court; but where the receiver, an officer of this court, is charged with having done an unlawful or wrongful act, in respect of which such receiver may not be sued in other courts, and the persons injured are compelled to apply to the court for which he was acting as agent for such relief as they ob-

tain, a very different question is presented as to the manner in which the case may be dealt with, and as to the orders which may be made on the receiver. This distinction and the doctrine upon this subject are stated by Judge Taft, with great force and clearness, in Felton v. Ackerman, 9 C. C. A. 457, 61 Fed. 225, as follows:

"In the present case, however, we are of the opinion that the principle relied on cannot aid the appellant. He is the receiver of the federal court, and, while it is true that this is an adversary proceeding, as already stated, he does not lose his character as an officer of the court, with all the consequences as to directness of remedy against him which this relation makes necessary. Section 2 of the act of August 13, 1888, defining the jurisdiction of the circuit courts of the United States, provides that whenever in any cause pending in any court of the United States, there shall be a receiver or manager in possession of any property, such receiver or manager shall manage and operate such property according to the requirements of the valid laws of the state in which such property shall be situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof; and then follows a provision for punishment of any receiver who shall violate the foregoing requirement. If Ackerman, by his petition and his proofs, shows that the receiver has been guilty of a public nuisance in erecting a fence across the highway, in the administration of the trust, it is the duty of the court to make an order enjoining him from doing so, even though in an independent action Ackerman as an individual may not be able to obtain relief. It is of the greatest importance that receivers of the federal courts shall not be violators of the state laws; and, wherever a court is made to know, in any proper way, that its receiver is violating the law of the state in which is the property of which he has charge, the court must sua sponte direct him to cease further violation. We cannot, therefore, on any technical rules of procedure, however well established as between private litigants, sustain this appeal, and reverse the order below, if it appears that the receiver's act, enjoined by the order of the court appealed from, was a violation of public right."

In this case, Judge Key had directed the receiver to remove a railway fence unlawfully put across the public highway, and this order was affirmed. Similar ruling was made, and a similar practice followed, in Handy v. Railroad Co., 31 Fed. 689. And in Thomas v. Railroad Co., 62 Fed. 670, Judge Taft said:

"The receiver is the agent of the court in operating the road. The petitioners are the employés of the receiver, and therefore are the employés of the court."

The cases are to this effect: That a court of the United States will not permit its receiver to do any unlawful act, nor any act which amounts to violence or a breach of the peace; and that, when such act shall first come to the knowledge of the court, and at the first opportunity, regardless of any technical pleading, the court will make such order as provides for full restitution, and will not permit its receiver to continue the unlawful act, nor obtain any advantage thereby. The court in such case properly holds that its officer and receiver, clothed with power from the court, shall not use that power oppressively nor unlawfully, but that, as such officer, he is under the highest obligation at all times to set an example of obedience to law, and of the pursuit of strictly peaceable methods in his conduct. This proposition is fully borne out by the cases cited, as well as many others not necessary to be noticed here. The transaction complained of in this case was a direct physical invasion of and injury to the property of the plaintiff, and was entirely without authority of law, being over the protest

of the owner of the property, and at a time and in a manner which made it peculiarly violent and lawless. The statutes of this state do not authorize an entry upon the land of another in any such manner nor for any such purpose as was done here. Sections 1569 to 1571, inclusive, of Milliken & Vertrees' Code, clearly show that the only entry which is lawfully made prior to making compensation is one for the purpose of preliminary survey, and these sections imply a denial of the right to make any other kind of entry. The last section only refers to cases, which often happen, of a railroad being built upon land, without objection, and apparently with the acquiescence, of the owner. Roberts v. Railroad Co., 158 U. S. 11, 15 Sup. Ct. 756, is an example of such cases, and of the facts which give rise to the estoppel on which they rest. A statute is not to be construed as authorizing an otherwise manifestly unlawful taking over the objection of the owner, unless its terms are such as to make that meaning clear beyond doubt.

In view of what has been said, prohibitory injunction will issue against the defendants Felton, Carroll, and Griggs, their servants and agents, and all persons claiming in privity with them, by conveyance, lease, or other contract, restraining them from occupying or using in any manner whatever the three cross-over switches above referred to, as well as that portion of the track put in at the same time, and crossing Ash street; and a mandatory injunction will issue against Mr. Felton, R. Carroll, and A. Griggs, requiring them to take up and remove said switches and said track at Ash street, and to restore the ground on which the same are situated, and the tracks of the plaintiff Terminal company, so as to leave them in the same plight and condition in which they were found at the time of the unlawful entry thereon on the night of August 3, 1895, and this they will be required to do within the space of 10 days from this date; and until that time further action and further orders in the case are reserved, and the question of costs will be reserved until its final disposition.